THE STATE OF OHIO, APPELLEE, *v*. DAVIS, APPELLANT.

[Cite as *State v. Davis,* 139 Ohio St.3d 122, 2014-Ohio-1615.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

(No. 2011-0538—Submitted October 22, 2013—Decided April 22, 2014.)

APPEAL from the Court of Appeals for Butler County,

No. CA2009-10-263, 2011-Ohio-787.

_____

PFEIFER, J.

{¶ 1} While on parole from a prior conviction of murder in the second degree, appellant Von Clark Davis shot Suzette Butler to death on December 12, 1983. A three-judge panel found him guilty of aggravated murder with a prior-conviction specification and sentenced him to death.

{¶ 2} On December 12, 1983, Davis offered Mark "Poppa" Lovette $60 in exchange for a favor. He then drove Lovette to a pawn shop, where Lovette bought a Raven P.25 semi-automatic handgun using Davis's money. Lovette gave the gun to Davis. Davis then gave Lovette more money and took him to a different store to buy ammunition.

{¶ 3} When Davis discovered that the ammunition did not fit the Raven, he took Lovette to a local gun store. There, Lovette bought a box of PMC .25-caliber automatic rounds, which he gave to Davis. Davis loaded the Raven and placed it under the driver's seat. After dropping Lovette off, Davis and Wade Coleman rode around drinking beer for 30 minutes to an hour.

{¶ 4} Later that day, Suzette Butler met her friend, Mona Aldridge, at the American Legion post in Hamilton. Shortly thereafter, Davis arrived. Davis and Butler had lived together for a time but had recently separated. Davis spoke with Butler at the bar, and eventually they sat together at a table and Aldridge joined

them. Aldridge testified at trial that she did not observe any argument or harsh words between them.

{¶ 5} After a short time, Butler told Aldridge that she would be "right back" and asked Aldridge to watch her jacket, cigarettes, and drink. Davis and Butler then walked out the front door. Several minutes later, Aldridge checked on Butler, saw Davis pointing a gun at Butler's head, and panicked and retreated into the bar. Within moments, several people entered the bar saying that someone had been shot.

{¶ 6} Reginald Denmark and Cozette Massey witnessed the shooting. As they walked in front of the American Legion post, they saw a man and a woman talking. Two shots rang out, and they saw the woman—later identified as Butler—fall. As she fell, another shot was fired. Finally, once Butler was down, the man bent down and shot her in the head. Both Massey and Denmark identified Davis as the shooter.

{¶ 7} An autopsy performed the next day revealed that Butler had died of multiple gunshot wounds to the left side of her head. Stippling around one of the entrance wounds indicated that the muzzle of the murder weapon had been less than 20 inches from Butler's head when the shot causing that wound had been fired.

{¶ 8} Four spent PMC shell casings were collected at the murder scene. Ronald Dye, a criminalist with the Ohio Bureau of Criminal Identification and Investigation, examined the shells and concluded that all four had been chambered in the same gun. Dye examined the four bullets removed from Butler's head and determined that they had been fired from a handgun manufactured by either Raven or Astra.

{¶ 9} The grand jury returned a two-count indictment against Davis. Count One charged him with the aggravated murder of Butler with prior calculation and design, R.C. 2903.01(A), with a firearm specification under R.C.

2

2929.71. Count One also carried a death specification under R.C. 2929.04(A)(5), alleging that Davis had been previously convicted of an offense an essential element of which was the purposeful killing of, or attempt to kill, another. Count Two charged Davis with having a weapon while under disability, R.C. 2923.13(A)(2). Davis waived his right to a jury trial and was tried to a three-judge panel.

{¶ 10} Davis testified on his own behalf at his 1984 trial. He admitted that Lovette had purchased a gun for him, but claimed that he had given the gun to a man named "Silky Carr" of Lexington, Kentucky. Davis also testified that he left Carr and Butler talking in front of the American Legion on the night of the murder and drove away. "Silky Carr," however, was never located.

{¶ 11} The panel found Davis guilty of all charges and specifications. After conducting the penalty phase, the panel sentenced Davis to death. The court of appeals affirmed the conviction and death sentence.

{¶ 12} Davis appealed to this court, and we affirmed his conviction. *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988) ("*Davis I*"). We also determined that the panel had improperly weighed a nonstatutory aggravating circumstance against the mitigating factors when it sentenced him to death and that the error could not be cured by independent review. Accordingly, we vacated the death sentence. *Id*. at 367-373. We further held that when a reviewing court vacates a death sentence imposed by a three-judge panel due to error occurring at the penalty phase, the state may seek a death sentence on remand (with two exceptions not germane to this case). *Id*. at syllabus. Accordingly, we remanded for resentencing "solely for the purpose of determining whether the remaining aggravating circumstance outweighs the mitigating factors presented by [Davis], beyond a reasonable doubt." *Id*. at 373.

{¶ 13} On remand, the same three-judge panel that had originally sentenced Davis conducted the resentencing hearing in August 1989. The panel

considered only the evidence presented in mitigation at Davis's 1984 trial. Davis was not permitted to introduce evidence concerning his adjustment to prison life or to present the testimony of a psychologist to provide a "psychological update" of Davis covering the period since his 1984 conviction and sentence.

{¶ 14} The panel again sentenced Davis to death. On appeal, the court of appeals affirmed the sentence. We also affirmed the sentence. *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192 (1992) ("*Davis II*").

{¶ 15} In 2007, the United States Court of Appeals for the Sixth Circuit granted habeas corpus relief and required that Davis be resentenced, on the ground that the panel on resentencing should have allowed Davis to introduce additional mitigating evidence. *Davis v. Coyle*, 475 F.3d 761 (6th Cir.2007).

{¶ 16} By the time of the subsequent resentencing, one of the original panel members had died, and the other two were no longer on the bench. Accordingly, the trial court convened a three-judge panel consisting of three new judges. Complying with the Sixth Circuit's decision, the new panel heard further mitigating evidence in September 2009 and sentenced Davis to death. The court of appeals affirmed. *State v. Davis*, 12th Dist. Butler No. CA2009-10-263, 2011-Ohio-787.

{¶ 17} The cause is now before this court on appeal as of right. Davis raises five propositions of law challenging his death sentence. For the reasons that follow, we conclude that all five propositions of law lack merit, and we affirm the judgment of the court of appeals.

## I. Attempt to Withdraw Jury Waiver

{¶ 18} In his first proposition of law, Davis contends that during his resentencing in 2009, the trial court should have allowed him to withdraw the jury waiver that he had executed before trial in 1984.

A. Factual and Procedural Background

{¶ 19} On May 8, 1984, Davis executed a written waiver of his right to a jury trial and election of trial to a three-judge panel.  The waiver states:

I, Von Clark Davis, defendant in the above cause, appearing in open court this 8th day of May, 1984, with my attorneys * * * do hereby voluntarily waive my right to trial by jury and elect to be tried by a court to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser, all the same being the elected judges of the General Division of the Court of Common Pleas of Butler County who are engaged in the trial of criminal cases, pursuant to Ohio Revised Code Section 2945.06.

I am waiving said trial by jury, and making this election to be tried by a court to be composed of three judges, with full knowledge of my right under the Constitution of the United States and of Ohio to a trial by a jury consisting of twelve jurors, whose verdict must be unanimous; with full knowledge of the consequences of such waiver and election under the laws of the State of Ohio; and without any compulsion, undue influence, promises or inducements of any kind made to me by anyone.

I further state that I have received the advice and counsel of my attorneys, with which I am satisfied, and being fully advised by them do hereby make this waiver and election of my own free will and accord.

{¶ 20} In *Davis I*, Davis disputed the voluntariness of his jury waiver.  He argued that the trial court's refusal to sever the aggravated-murder charge from

the charge of having a weapon under disability " 'forced' him to choose a hearing by a three-judge panel." 38 Ohio St.3d at 363, 528 N.E.2d 925. We rejected that claim. *Id*. at 364.

{¶ 21} After we in *Davis I* remanded the case to the trial court for resentencing, Davis filed a motion to withdraw his jury waiver. The trial court denied the motion. Davis challenged that decision on his subsequent appeal, arguing that his 1984 waiver was not "an 'informed choice,' " because in 1984 he did not realize that his choice could ultimately affect his eligibility to be resentenced to death in the event that his death sentence was vacated. *Davis II*, 63 Ohio St.3d at 48-49, 584 N.E.2d 1192.

{¶ 22} This argument was advanced, in part, because in 1987, three years after Davis's trial, we held that after a death sentence imposed after a jury trial was vacated, the trial court could not impanel a new jury on remand and therefore that the defendant could not be resentenced to death. *State v. Penix*, 32 Ohio St.3d 369, 372-373, 513 N.E.2d 744 (1987). We distinguished *Penix* in *Davis I,* holding at the syllabus that in a case tried to a three-judge panel, *Penix* did not apply and that a defendant in that situation would be eligible to receive a death sentence on remand. *See also Davis I* at 373.

{¶ 23} In *Davis II*, we did not accept Davis's argument that the holding in *Penix* should apply to him. *Id*. at 48. (The General Assembly later amended R.C. 2929.06 to abrogate the *Penix* rule. *See State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 6.) We also rejected Davis's argument that his 1984 waiver was not an "informed choice." *Davis II* at 48-49.

{¶ 24} In 2007, in federal habeas corpus litigation, Davis argued that the trial court had erred by denying the motion to withdraw his waiver of a jury, raising the same challenge to his jury waiver that we had rejected in *Davis II*. The Sixth Circuit rejected it as well. *Davis v. Coyle*, 475 F.3d at 779-780. In dictum, however, the Sixth Circuit expressed the view that "there is a legitimate question

as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing." *Id*. at 780. As a result of the federal litigation, the case again returned to the trial court for resentencing.

{¶ 25} In the trial court in 2008, Davis moved to withdraw his jury waiver. The trial court denied the motion on several independent grounds. The trial court determined that the validity of the jury waiver had been litigated in *Davis II* and in *Davis v. Coyle*; hence, res judicata barred Davis from litigating its validity. Alternatively, the court determined that R.C. 2945.05 permitted withdrawal only "before the commencement of the trial." Moreover, the court stated that R.C. 2929.06(B) expressly vested "exclusive responsibility to determine Defendant's sentence in a three judge panel and not in a jury."

{¶ 26} On appeal, the court of appeals rejected Davis's claim that the trial court's denial of the motion to withdraw the jury waiver was erroneous. The court held that the claim was barred by the law-of-the-case doctrine and by principles of res judicata. 2011-Ohio-787 at ¶ 16-28. The court of appeals then went on to also reject Davis's jury-waiver claims on their merits. *Id*. at ¶ 29-39.

### B. Law of the Case/Res Judicata

{¶ 27} The law-of-the-case doctrine provides that the " 'decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Hubbard ex rel. Creed v. Sauline,* 74 Ohio St.3d 402, 404, 659 N.E.2d 781 (1996), quoting *Nolan v. Nolan,* 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). The doctrine "precludes a litigant from attempting to rely on arguments at a retrial which were fully pursued, or available to be pursued, in a first appeal. New arguments are subject to issue preclusion, and are barred." *Sauline* at 404-405.

{¶ 28} Res judicata operates in a similar way.

"Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at the trial*, which resulted in that judgment of conviction, *or on an appeal* from that judgment."

(Emphasis sic.) *State v. Szefcyk*, 77 Ohio St.3d 93, 95, 671 N.E.2d 233 (1996), quoting *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus.

{¶ 29} The state argues that these doctrines bar Davis from making any further challenge to the validity of his 1984 jury waiver. Both doctrines apply, however, only to arguments that were available to be pursued in a first appeal and to claims that either were or could have been raised at trial or on appeal. A claim that Davis's 1984 jury waiver was invalid ab initio because it was less than knowing, voluntary, and intelligent at the time it was made would be barred in the current appeal. But that is not Davis's principal argument here. Instead, Davis claims that he should have been permitted to withdraw the waiver as to the 2009 resentencing proceeding. Davis also claims that changed circumstances since 1984 rendered the waiver less than knowing, voluntary, and intelligent as to the 2009 resentencing. Davis could not have raised these claims in his earlier appeals.

{¶ 30} Davis's claims center on the fact that the three-judge panel that sentenced him in 2009 was not the same three-judge panel before which he had expected to be tried and sentenced when he waived a jury trial in 1984. Davis could not have raised these arguments during his initial appeal that was resolved in 1988 or in his later appeal that was resolved in 1992. In his original sentencing

and his 1989 resentencing, Davis was sentenced by the specific panel mentioned in his jury waiver: Judges Bruewer, Stitsinger, and Moser. In 2009, he was sentenced by a different panel. Thus, the factual basis of his claims did not exist before 2009.

{¶ 31} One portion of Davis's argument is barred by res judicata. Davis asks us to reconsider our holding in *Davis II* in light of *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). In *Padilla*, the court held that a defendant's counsel has a duty to advise the defendant of certain immigration-related collateral consequences of a guilty plea, in particular the possibility of deportation. *Id.* at 374. Davis argues that the trial court should have advised him of the "collateral consequences" of his jury waiver at the time of his original jury waiver. We conclude that this claim could have been raised on Davis's first appeal in *Davis I*. *Padilla* is inapposite in any event. *Padilla*'s holding concerns what an attorney must advise a defendant before the defendant enters a plea of guilty. It says nothing about what a trial court must advise a defendant before accepting a jury waiver.

{¶ 32} Davis's first proposition of law rests mainly on arguments that he could not have raised on appeal in 1988 or 1992. Those arguments are not barred by res judicata or the law-of-the-case doctrine, and Davis may pursue them in the instant appeal. Accordingly, we will address the merits of Davis's first proposition of law.

### C. Merits

#### 1. R.C. 2929.06(B)

{¶ 33} When a criminal conviction is reversed on appeal and remanded for retrial, the general rule is that a jury waiver executed in the original trial is voided, and the defendant is entitled to a jury trial on remand unless he again validly waives that right. *See* 6 LaFave, Israel, King & Kerr, *Criminal Procedure*,

Section 22.1(h), 36 (3d Ed.2007). *See, e.g., United States v. Groth*, 682 F.2d 578, 580 (6th Cir.1982); *People v. Schwartz*, 3 Ill.2d 520, 524, 121 N.E.2d 758 (1954).

{¶ 34} In the cases cited above, a conviction was either reversed on appeal or was set aside, necessitating a retrial on the issue of guilt or innocence. In this case, Davis's conviction was not reversed or set aside. Furthermore, in a capital case in Ohio, when the initial trial and sentencing proceedings were held before a three-judge panel, impaneling a jury solely for the purpose of resentencing is precluded by statute. *See* R.C. 2929.06(B), which states:

> Whenever any court of this state or any federal court sets aside, nullifies, or vacates a sentence of death imposed upon an offender because of error that occurred in the sentencing phase of the trial and if division (A) of this section does not apply, the trial court that sentenced the offender shall conduct a new hearing to resentence the offender. If the offender was tried by a jury, the trial court shall impanel a new jury for the hearing. If the offender was tried by a panel of three judges, that panel or, if necessary, a new panel of three judges shall conduct the hearing.

Under this provision, because Davis had been tried to a three-judge panel, he was not entitled to a jury on resentencing.

{¶ 35} Davis asks us to "be guided by" the rule of lenity, codified in R.C. 2901.04(A), in considering this issue. He fails to explain precisely how the rule of lenity is pertinent. "The rule of lenity is a principle of statutory construction that provides that a court will not interpret a criminal statute so as to increase the penalty it imposes on a defendant if the intended scope of the statute is ambiguous." *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, ¶ 38. The rule applies only "to the construction of ambiguous statutes." *Id.*

at ¶ 40. *See Morgan v Adult Parole Auth.*, 68 Ohio St.3d 344, 347, 626 N.E.2d 939 (1994) (rule of lenity does not apply when statute is unambiguous). Davis identifies no ambiguity in R.C. 2929.06(B), and we perceive no ambiguity to which we could apply the rule of lenity.

**{¶ 36}** Citing *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, syllabus, Davis contends that he "no longer stood convicted under Ohio law" once the Sixth Circuit granted relief from his death sentence because a final judgment of conviction requires a sentence as well as a guilty verdict. But *Baker* involved a consideration of the elements that must be included in a trial court's judgment entry to constitute a final, appealable order. The existence of a final, appealable order is not at issue here. The question before us is whether Davis could have been resentenced by a three-judge panel pursuant to R.C. 2929.06(B) or was entitled to a jury trial for his resentencing.

**{¶ 37}** Given the clear command of R.C. 2929.06(B), Davis cannot obtain the relief he seeks unless the application of R.C. 2929.06(B) violated his constitutional rights. We turn, then, to the constitutional issues raised by Davis.

2. Constitutionality

**{¶ 38}** Davis's principal contention appears to be that his original 1984 jury waiver, even if valid at the time it was made, cannot be considered knowing, voluntary, and intelligent when applied to his resentencing in 2009. *See State v. Campbell*, 414 N.J.Super. 292, 298, 998 A.2d 500 (App.Div.2010) ("one cannot knowingly waive rights in connection with an unanticipated second trial"). In this regard, Davis emphasizes that the 2009 resentencing was conducted before a three-judge panel composed of different judges than the panel that had tried the case in 1984. In particular, his 1984 waiver specifically stated that he "waive[d his] right to trial by jury and elect[ed] to be tried by a court to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser * * *."

**{¶ 39}** The starting point for constitutional analysis of Davis's claim is the recognition that although the Sixth Amendment guarantees the right to trial by jury, neither the Sixth nor the Eighth Amendment creates a constitutional right to be *sentenced* by a jury, even in a capital case. "[D]espite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. * * * The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue." *Spaziano v. Florida*, 468 U.S. 447, 459, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). *See also Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion); *Harris v. Alabama*, 513 U.S. 504, 515, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) ("The Constitution permits the trial judge, acting alone, to impose a capital sentence").

**{¶ 40}** Because there is no constitutional right to be sentenced by a jury, the Sixth Amendment does not require a waiver in order for a defendant to be sentenced without a jury. "Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, even were we to hold the 1984 jury waiver insufficient or inapplicable as to the 2009 resentencing hearing, we would find no constitutional bar to conducting that hearing without a jury pursuant to R.C. 2929.06(B).

**{¶ 41}** Davis's argument that his 1984 waiver could not be knowing and intelligent when applied to his 2009 resentencing because of changed circumstances appears to require that a defendant waiving a jury trial possess more information than courts have usually held sufficient for a knowing and intelligent jury waiver. "A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the

community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and * * * a judge alone will decide guilt or innocence should he waive his jury trial right." *United States v. Martin*, 704 F.2d 267, 273 (6th Cir.1983). *See also United States ex rel. Williams v. DeRobertis*, 715 F.2d 1174, 1180 (7th Cir.1983) (defendant must understand that the choice he faces is to be judged by a jury composed of people from the community as opposed to having his guilt or innocence determined by a judge); *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 44-48.

**{¶ 42}** Finally, we address Davis's contention that *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), entitled him to have his resentencing hearing tried to a jury. *Duncan* holds that the Sixth Amendment right to a jury trial "is fundamental to the American scheme of justice" and that the Fourteenth Amendment incorporates it and "guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." *Id*. at 149. *Duncan* says nothing about jury sentencing, and—as we have already noted—there is no constitutional right to be sentenced by a jury.

**{¶ 43}** R.C. 2929.06(B) requires that resentencing be done by a three-judge panel if the original trial was held before a three-judge panel. Nothing in the Sixth Amendment prohibits the application of R.C. 2929.06(B) to this case. Therefore, we overrule Davis's first proposition of law.

## II. Retroactivity and Ex Post Facto Claims

**{¶ 44}** In his third proposition of law, Davis contends that R.C. 2929.06(B), as amended, cannot be applied to him because he murdered Butler before the amended statute took effect. As explained earlier, the members of the three-judge panel that had tried and sentenced Davis in 1984 (and that had resentenced him in 1989) were unavailable in 2009. Hence, the 2009

resentencing took place before a panel of three different judges, none of whom had participated in the original trial.

**{¶ 45}** When a death sentence is nullified for error in the sentencing phase, R.C. 2929.06(B) provides: "If the offender was tried by a panel of three judges, that panel or, if necessary, a new panel of three judges shall conduct the hearing." This provision took effect October 16, 1996. The statute was originally designated R.C. 2929.06(A)(2) (*see* Sub.S.B. No. 258, 146 Ohio Laws, Part VI, 10539, 10548-10549) and received its current designation in 1998 (*see* Sub.S.B. No. 107, 147 Ohio Laws, Part IV, 7435, 7438). *See State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 6. R.C. 2929.06(E), effective March 23, 2005, expressly provides that R.C. 2929.06 applies to all offenders sentenced to death for an aggravated murder committed on or after October 19, 1981 (*see* Sub.H.B. No. 184, 150 Ohio Laws, Part III, 5043, 5051). *See White* at ¶ 8.

**{¶ 46}** Davis contends that at the time of Butler's murder on December 12, 1983, Ohio law did not allow a capital defendant to be resentenced to death by a different three-judge panel than the one that had originally tried and sentenced him. He contends that the imposition of a death sentence on him by a new three-judge panel pursuant to amended R.C. 2929.06(B) violates the Retroactivity Clause of the Ohio Constitution and the Ex Post Facto Clause of the United States Constitution. The state argues that Ohio law already permitted a capital defendant who had been tried by a three-judge panel and whose case was remanded for resentencing to be resentenced to death by a different three-judge panel and, therefore, that R.C. 2929.06(B) did not change the law. We have never decided this point, and we need not decide it here.

A. The Ohio Constitution's Retroactivity Clause

**{¶ 47}** Article II, Section 28 of the Ohio Constitution provides: "The general assembly shall have no power to pass retroactive laws." In determining

whether a statute's retroactive application violates the Constitution, a court must determine whether the General Assembly intended the statute to apply retroactively. *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 522 N.E.2d 489 (1988), paragraph one of the syllabus. If retroactive application was intended, the court must determine whether the challenged statute is substantive or remedial. *Id*. at paragraph three of the syllabus. "[T]he constitutional test for substantive legislation focuses on new laws that reach back in time and create new burdens, deprivations, or impairments of vested rights." *Bielat v. Bielat*, 87 Ohio St.3d 350, 359, 721 N.E.2d 28 (2000). *See generally Van Fossen* at 107.

{¶ 48} We have recently considered whether R.C. 2929.06(B) violates the Retroactivity Clause. As to the first part of the test, we held: "The General Assembly has clearly expressed its intent that RC. 2929.06(B) apply retroactively." *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at paragraph two of the syllabus. As to the second part, we held: "R.C. 2929.06(B) is remedial, not substantive. Hence, the Retroactivity Clause of the Ohio Constitution does not bar its retroactive application in cases where the aggravated murder was committed before its enactment, but the death sentence was set aside after its enactment." *Id.* at paragraph three of the syllabus.

{¶ 49} In *White*, a capital defendant had been convicted of aggravated murder with death specifications and sentenced to death after a jury trial. After the enactment of R.C. 2929.06(B), he obtained habeas corpus relief from his death sentence, obliging the trial court to resentence him. *Id.* at ¶ 1-2. At his resentencing, White argued that R.C. 2929.06(B) could not constitutionally be applied to a case involving a crime committed before its enactment. The trial court concluded that the Retroactivity Clause prohibited the application of R.C. 2929.06(B) to White's resentencing. The court of appeals reversed. *Id*. at ¶ 12-14. We affirmed that decision, stating:

> [T]he application of R.C. 2929.06(B) to White's resentencing would not increase White's potential sentence, impair any of White's vested or accrued rights, violate any reliance interest or any reasonable expectation of finality, or impose any new burdens on him. We therefore hold that R.C. 2929.06(B) is remedial, not substantive. Hence, the Retroactivity Clause of the Ohio Constitution does not bar its retroactive application in cases where the aggravated murder was committed before its enactment, but the death sentence was set aside after its enactment.

*Id.* at ¶ 48.

{¶ 50} Davis was sentenced by a three-judge panel, but in all relevant respects his situation is indistinguishable from White's for purposes of the inquiry here. He murdered Butler on December 12, 1983, before the General Assembly enacted R.C. 2929.06(B). His death sentence was set aside on January 29, 2007, more than ten years after R.C. 2929.06(B) took effect. As in White's case, R.C. 2929.06(B) did not increase Davis's potential sentence, which was the same before and after the amendment of R.C. 2929.06.

{¶ 51} Neither does the amended statute impair any vested or accrued rights. Davis claims entitlement to the right to be resentenced under the law as it stood in 1983. But, similar to the defendant in *White*, Davis cannot be regarded as having a "vested or accrued" right to be resentenced under the former law. Davis's right to be resentenced under the former law could not exist until several intervening events took place, including the setting aside of his death sentence. By the time his death sentence was set aside in 2007, R.C. 2929.06(B) and (E) had been adopted, so Davis's right to be resentenced under former law never attained the status of a "vested or accrued" right. *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 34-37.

{¶ 52} Finally, R.C. 2929.06(B) did not impose any new burden on Davis. The burden he faced on resentencing was the same burden he faced on December 12, 1983: that of defending a death-penalty proceeding. *White* at ¶ 41. Moreover, Davis "can point to no event preceding the enactment of R.C. 2929.06(B) and (E) that entitled him to a reasonable expectation of finality." *Id.* at ¶ 43. Hence, "retroactive application of R.C. 2929.06(B) to [Davis's] resentencing does not create a new burden 'in the constitutional sense.' " *Id.* at ¶ 44, quoting *State ex rel. Matz v. Brown*, 37 Ohio St.3d 279, 281, 525 N.E.2d 805 (1988).

{¶ 53} We reject Davis's claim that the application of R.C. 2929.06(B) to his resentencing violates the Retroactivity Clause of the Ohio Constitution.

### B. The Ex Post Facto Clause

{¶ 54} Article I, Section 10 of the United States Constitution provides: "No State shall * * * pass any * * * ex post facto Law." In *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798), Justice Chase identified the four kinds of laws that come within the Ex Post Facto Clause:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*.

(Emphasis sic.) The United States Supreme Court has adopted Justice Chase's definition of "ex post facto laws" as authoritative. *See*, *e.g.*, *Stogner v. California*, 539 U.S. 607, 611, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003); *Carmell v. Texas*, 529 U.S. 513, 525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

**{¶ 55}** In *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 64, we rejected an Ex Post Facto Clause challenge to R.C. 2929.06(B), stating: "We hold that R.C. 2929.06(B) does not fall within any of the four categories of ex post facto laws identified in *Calder*. Hence, its application in this case does not violate the Ex Post Facto Clause." We therefore reject Davis's Ex Post Facto Clause claim, and with it his third proposition of law.

III. Claim that the Trial Panel Gave Insufficient Weight to Mitigating Evidence

**{¶ 56}** In his second proposition of law, Davis contends that the three-judge panel violated the Eighth Amendment, as construed in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), by giving either insufficient weight or no weight at all to his mitigating evidence. Davis contends that *Eddings* requires the sentencer in a capital case to assign some weight to any relevant mitigating evidence. *Eddings* holds: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (Emphasis sic.) *Id.* at 113-114. The sentencer in a capital case "may not give [mitigating evidence] no weight by excluding such evidence from [its] consideration." *Id*. at 114-115.

**{¶ 57}** During the 2009 resentencing proceedings, the defense called as a mitigation witness Cynthia Mausser, the chair of the Ohio Parole Board. Mausser explained the parole process and the factors the parole board examines in determining whether to grant parole. Defense counsel asked Mausser a hypothetical question, based on the situation in this case, about a defendant who was paroled from a second-degree-murder conviction, was convicted of a second

murder with death specifications, and was sentenced to death, but who was subsequently resentenced to "30 to life." Mausser testified that "that person * * * would likely spend a large portion of the remainder of their life in prison."

{¶ 58} In the sentencing opinion, the resentencing panel specifically stated that it had "considered the testimony of Cynthia Mausser offered to show the probability that Defendant would never be released from prison if given a sentence less than death." The panel found that Mausser's testimony was "entitled to no weight" because it was "highly speculative and unconvincing."

{¶ 59} *Eddings* does not require a court to give any particular weight to relevant mitigating evidence. *Eddings* states that a sentencing court "may not give [relevant mitigating evidence] no weight by excluding such evidence from [its] consideration." *Id.*, 455 U.S. at 114-115, 102 S.Ct. 869, 71 L.Ed.2d 1. Thus, a court may not refuse to consider relevant mitigating evidence (as the trial court did in *Eddings*) and therefore give it no weight as a result of that refusal. But *Eddings* does not preclude a court from considering mitigating evidence and determining that it deserves no weight. *Eddings* "expressly refused to dictate what weight or importance to assign to particular mitigating factors." *State v. Brewer*, 48 Ohio St.3d 50, 56, 549 N.E.2d 491 (1990), citing *Eddings* at 114-115 and 117. The court in *Eddings* stated that the sentencer is permitted to "determine the weight to be given relevant mitigating evidence," *id.* at 114-115, and in vacating the death penalty further stated: "On remand, the state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances. We do not weigh the evidence for them." *Id.* at 117.

{¶ 60} Although the Eighth Amendment "requires the sentencer to listen" to relevant mitigating evidence, *Eddings* at 115, fn.10, it does not require the sentencer to reach any particular conclusion about the weight of that evidence. Thus, the United States Supreme Court has described as "settled" the proposition "that the Constitution does not require a State to ascribe any specific weight to

particular factors, either in aggravation or mitigation, to be considered by the sentencer." *Harris v. Alabama*, 513 U.S. at 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004, citing *Eddings* at 113-115. We have stated that "courts need not give weight to relevant mitigating evidence simply because they must consider such evidence under Supreme Court precedents." *State v. Richey*, 64 Ohio St.3d 353, 369, 595 N.E.2d 915 (1992). *Accord State v. Mitts*, 81 Ohio St.3d 223, 235, 690 N.E.2d 522 (1998); *State v. LaMar*, 95 Ohio St.3d 181, 209-210, 767 N.E.2d 166 (2002).

{¶ 61} Davis also complains that the resentencing panel gave insufficient weight to various factors offered in mitigation. Specifically, he complains that the panel gave "little weight" to his personality disorder, to his good behavior in prison, and to the fact that his daughter has forgiven him for killing her mother. The panel likewise gave "little or no weight" to Davis's dysfunctional family and childhood experiences and found that the love and support of Davis's family and friends "does not deserve significant weight." Davis argues that these determinations "improperly discounted" the mitigating evidence that he adduced and thereby violated the Eighth Amendment.

{¶ 62} "[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer." *Harris*, 513 U.S. at 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004. Capital sentencing requires a "reasoned *moral* response to the defendant's background, character, and crime." (Emphasis sic.) *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). The weight to be given mitigating factors "is necessarily an individual decision by the fact finder." *Richey*, 64 Ohio St.3d at 369-370, 595 N.E.2d 915. It is subject to correction by means of independent appellate reweighing and is not a matter of law. *See State v. Mills*, 62 Ohio St.3d 357, 376, 582 N.E.2d 972 (1992); *State v. Fox*, 69 Ohio St.3d 183, 191, 193, 631 N.E.2d 124 (1994).

{¶ 63} In his brief, Davis quotes a statement from *Porter v. McCollum*, 558 U.S. 30, 42, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009), which he describes as a case in which a state supreme court " 'either did not consider or unreasonably discounted the mitigation evidence' adduced in a post conviction hearing." However, unlike this case, *Porter* did not involve a claim that the sentencing court had given insufficient weight to, and thus failed to fully consider, mitigating evidence. *Porter* involved a claim that defense counsel had rendered ineffective assistance by failing to investigate, discover, and present relevant mitigating evidence. Similarly, *Wiggins v. Smith*, 539 U.S. 510, 534-538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 390-393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), also cited by Davis, are ineffective-assistance cases involving trial counsel's failure to investigate and present mitigating evidence.

{¶ 64} The issue in *Porter* was whether the petitioner had demonstrated ineffective assistance under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Porter* at 38-39. Under the prejudice prong of *Strickland,* the petitioner in *Porter* was required to "show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Id.* at 41. To assess that probability, the *Porter* court considered " 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[hed] it against the evidence in aggravation.' " *Id.*, quoting *Williams v. Taylor*, 529 U.S. 362, 397-398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

{¶ 65} The *Porter* court was not directly reviewing a trial court's weighing of aggravation against mitigation in the penalty phase; it was reviewing a state court's analysis of an ineffective-assistance claim on collateral review. In evaluating the prejudice component of that claim, the court considered the likelihood that had the evidence been presented in the penalty phase, the sentencer

would have given it decisive weight. In the context of assessing prejudice while analyzing an ineffective-assistance claim, the *Porter* court determined that the state court had erred by "unreasonably discount[ing] the mitigation evidence adduced in the postconviction hearing." *Id.*, 558 U.S. at 42, 130 S.Ct. 447, 175 L.Ed.2d 398. Thus, *Porter* does not stand for the proposition that the Eighth Amendment forbids a sentencer to "discount" mitigating evidence introduced at the penalty phase of the trial.

{¶ 66} Davis also argues that by giving little or no weight to two categories of mitigating evidence, the resentencing panel acted inconsistently with the weight that we gave to similar mitigating evidence in our independent review in *Davis II*. In *Davis II*, 63 Ohio St.3d at 50-51, 584 N.E.2d 1192, we gave "some, but very little, weight in mitigation" to Davis's "nature and character," including his disciplinary record in prison while he was serving his sentence for his 1971 murder conviction. At his 2009 resentencing hearing, Davis adduced evidence of his good behavior while on death row, and the resentencing panel gave "little weight" to that evidence. This is not inconsistent with our giving "some, but very little, weight" to similar evidence in *Davis II*. Davis creates the claimed inconsistency by omitting the phrase "but very little" when he selectively quotes *Davis II* on this point.

{¶ 67} In *Davis II* at 51, we assigned "some weight" to Davis's personality disorder based on psychologist Dr. Roger Fisher's testimony in the 1984 mitigation hearing. The resentencing panel here heard testimony from a different psychologist, Dr. Robert Smith, who testified that Davis has a borderline personality disorder. The panel found "that Dr. Smith's diagnosis, even if valid, is entitled to little weight in mitigation." In *Davis II*, we reviewed the record of the 1984 mitigation hearing; the resentencing panel here was evaluating the evidence presented in the 2009 mitigation hearing. There is nothing inconsistent

about the slightly different conclusion because the conclusions were based on different testimony.

**{¶ 68}** Finally, Davis argues that by giving little weight to his good behavior in prison, the resentencing panel was inconsistent with the Sixth Circuit's statement in *Davis v. Coyle,* 475 F.3d at 773, that this evidence is "highly relevant." Davis's argument "is inconsistent with the *Eddings* court's express refusal to usurp the weighing function of state courts." *State v. Cooey*, 46 Ohio St.3d 20, 39, 544 N.E.2d 895 (1989), citing *Eddings*, 455 U.S. at 114-115 and 117, 102 S.Ct. 869, 71 L.Ed.2d 1.

**{¶ 69}** Davis's second proposition of law is overruled.

IV. Delay in Execution of Death Sentence

**{¶ 70}** Davis was originally sentenced to death in 1984. In his fifth proposition of law, he contends that "[e]xecuting [him] after such a lengthy stay on death row constitutes cruel and unusual punishment." To support this claim, Davis cites separate opinions of justices of the United States Supreme Court in cases in which the full court denied writs of certiorari. *See Lackey v. Texas*, 514 U.S. 1045, 1045-1047, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J., respecting the denial of certiorari); *Thompson v. McNeil*, 556 U.S. 1114, 1114-1116, 129 S.Ct. 1299, 173 L.Ed.2d 693 (2009) (Stevens, J., respecting the denial of certiorari); *id*. at 1119-1121 (Breyer, J., dissenting from the denial of certiorari). *But see Knight v. Florida*, 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (Thomas, J., concurring in the denial of certiorari) (rejecting "proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed"); *Foster v. Florida*, 537 U.S. 990, 123 S.Ct. 470, 154 L.Ed.2d 359 (2002) (Thomas, J., concurring in the denial of certiorari).

**{¶ 71}** Numerous courts have rejected claims that delays between the imposition and the execution of a death sentence constitute cruel and unusual

punishment. *See Fearance v. Scott*, 56 F.3d 633, 638-639 (5th Cir.1995); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir.1995); *Free v. Peters*, 50 F.3d 1362 (7th Cir.1995); *Ex parte Bush*, 695 So.2d 138, 139-140 (Ala.1997); *State v. Schackart*, 190 Ariz. 238, 259, 947 P.2d 315 (1997); *People v. Massie*, 19 Cal.4th 550, 574, 79 Cal.Rptr.2d 816, 967 P.2d 29 (1998); *Rose v. State*, 787 So.2d 786, 805 (Fla.2001); *Halvorsen v. Commonwealth*, 258 S.W.3d 1, 11 (Ky.2007), fn. 31 (collecting cases); *State v. Smith*, 280 Mont. 158, 183-185, 931 P.2d 1272 (1996); *State v. Moore*, 256 Neb. 553, 563-566, 591 N.W.2d 86 (1999). In *Moore*, the Nebraska Supreme Court stated that "[i]t would be a mockery of justice to conclude that delays caused by satisfying the Eighth Amendment themselves violate it." *Id*. at 565.

**{¶ 72}** Davis argues that because he has been resentenced twice due to error in the sentencing proceedings, the resulting delay is the state's fault, not his. *See, e.g.*, *Elledge v. Florida*, 525 U.S. 944, 945, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998) (Breyer, J., dissenting from the denial of certiorari) (opining that a lengthy delay was caused by "the State's own faulty procedures," not by "frivolous appeals"). We are not persuaded. As the Eighth Circuit stated in *Chambers v. Bowersox*, 157 F.3d 560 (8th Cir.1998):

> [D]elay, in large part, is a function of the desire of our courts * * * to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life. Chambers's strongest argument is that the State has had to try him three times before getting it right. That is true, but there is no evidence, not even a claim, that the State has deliberately sought to convict Chambers invalidly in order to prolong the time before it could secure a valid conviction and execute him. * * * Delay has come about because Chambers, of course with justification, has contested the

judgments against him, and, on two occasions, has done so successfully.

*Id*. at 570.

{¶ 73} American courts have stated other reasons why Eighth Amendment execution-delay claims should not be recognized. Sustaining such claims by "placing a substantial premium on speed rather than accuracy" could create a disincentive for "err[ing] on the side of caution." *McKenzie v. Day*, 57 F.3d 1461, 1467 (9th Cir.1995). *Accord State v. Moore*, 256 Neb. at 565-566, 591 N.W.2d 86. "[I]t is unclear * * * whether, even if it were held that delay in the [execution] of the death penalty constitutes cruel and unusual punishment, commutation of the death penalty will turn out to be the appropriate remedy." *McKenzie* at 1467.

{¶ 74} Davis cites five decisions by foreign and international courts that, in his view, establish an international norm recognizing that long postsentencing delays of executions are cruel. *Vatheeswaran v. Tamil Nadu*, 2 S.C.R. 348, 353 (India 1983); *Pratt v. Atty. Gen. for Jamaica*, 3 S.L.R. 995, 2 A.C. 1, 4 All E.R. 769 (Privy Council 1993) (en banc); *Soering v. United Kingdom*, 11 Eur.Hum.Rts.Rep. 439 (Eur.Ct.Hum.Rts.1989); *Catholic Comm. for Justice & Peace in Zimbabwe v. Atty. Gen.*, 1 Zimb.L.R. 239, 14 Hum.Rts.L.J. 323 (1993); *Minister of Justice v. Burns*, 1 S.C.R. 283 (Canada 2001). Davis contends that these decisions support his Eighth Amendment claim because we must look to international norms when interpreting the Eighth Amendment's guarantee against cruel and unusual punishment. *See Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Although *Roper* does discuss "international opinion" in support of its Eighth Amendment holding, *id.* at 575-578, the role of international opinion in this inquiry is much more limited than Davis would have it.

**{¶ 75}** *Roper* held that the infliction of the death penalty for crimes committed before age 18 is cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. at 578. *Roper* reached this conclusion by considering "[t]he evidence of national consensus against the death penalty for juveniles." *Id.* at 564. The court concluded that "the objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles * * * as 'categorically less culpable that the average criminal.' " *Id.* at 567, quoting *Atkins v. Virginia*, 536 U.S. 304, 316, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The court also analyzed whether the penological justifications for the death penalty applied to juvenile murderers and concluded that they did not. *Roper* at 568-572. Finally, the court stated that "[o]ur determination * * * finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty." *Id.* at 575. Specifically, the court stated that "only seven countries other than the United States have executed juvenile offenders since 1990" and that all seven had either abolished or publicly disavowed capital punishment for juveniles since then. *Id*. at 577. This led the court to "acknowledge the overwhelming weight of international opinion against the juvenile death penalty." *Id*. at 578.

**{¶ 76}** The *Roper* court cited and discussed the nearly universal rejection of a particular practice as establishing that the practice in question was rejected by "the overwhelming weight of international opinion." *Id*., 543 U.S. at 575-578, 125 S.Ct. 1183, 161 L.Ed.2d 1. Although it referred to world opinion, *Roper* established that world opinion is not controlling in Eighth Amendment jurisprudence, stating: "The opinion of the world community, while not

controlling our outcome, does provide respected and significant confirmation for our own conclusions." *Id*. at 578.

**{¶ 77}** In this case, Davis fails to show that lengthy waits between sentencing and execution contravene "our society's evolving standards of decency." *Id*. at 563. Absent some such showing, the foreign cases Davis cites cannot advance his Eighth Amendment claim.

**{¶ 78}** Davis also argues that "[b]ecause of the long delays between sentencing and execution, and the conditions in which the condemned are kept, execution of the death penalty in [his] case constitutes 'cruel, inhuman or degrading treatment or punishment' in violation of Article VII of the International Covenant on Civil and Political Rights [ICCPR]." As Davis concedes, however, the ICCPR was approved by the United States Senate subject to the reservation that " 'cruel, inhuman, or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." *Buell v. Mitchell*, 274 F.3d 337, 371 (6th Cir.2001), quoting 138 Cong.Rec. S-4781-01, 4783 (1992). Thus, the ICCPR provides no basis, independent of the Eighth Amendment, for holding that delay between execution and sentence deprives the state of the right to execute the death sentence against Davis. Furthermore, the ICCPR is not self-executing and hence could not be enforced by courts in the absence of a federal statute implementing it. *Buell* at 372. *See also Halvorsen v. Commonwealth*, 258 S.W.3d at 11 (rejecting ICCPR claim in context of challenge to execution delay). We reject Davis's ICCPR claim and his Eighth Amendment claim.

**{¶ 79}** Davis's fifth proposition of law is overruled.

### V. Independent Sentence Review

**{¶ 80}** In his fourth proposition of law, Davis contends that the aggravating circumstance in his case does not outweigh the mitigating factors

beyond a reasonable doubt. R.C. 2929.05 requires this court to independently review the death sentence imposed on Davis. We must determine whether the evidence supports the jury's finding of an aggravating circumstance, whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt, and whether the death sentence is proportionate to those affirmed in similar cases.

## A. Aggravating Circumstance

{¶ 81} Davis was convicted of a single death specification: that "[p]rior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another * * *." R.C. 2929.04(A)(5). At trial, the state introduced a certified copy of a 1971 judgment entry of conviction in case No. 21655, in which Von C. Davis was convicted of murder in the second degree under former R.C. 2901.05. The purposeful killing of another was an essential element of second-degree murder under former R.C. 2901.05. *State v. Butler*, 11 Ohio St.2d 23, 32, 227 N.E.2d 627 (1967). The parties stipulated the authenticity of the judgment entry and the fact that the defendant was the same Von C. Davis referred to in the judgment entry. In *Davis II*, 63 Ohio St.3d at 50, 584 N.E.2d 1192, we found "that the aggravating specification was proved beyond a reasonable doubt."

## B. Mitigating Factors

{¶ 82} At his 2009 resentencing, Davis called 11 witnesses, including relatives, acquaintances, and experts. There was no evidence concerning any of the specific mitigating factors enumerated in R.C. 2929.04(B)(1) through (6). The mitigating evidence presented falls under the "catchall" factor of R.C. 2929.04(B)(7), which requires consideration of "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Davis cites the following mitigating factors: his upbringing in a dysfunctional family, his personality disorders, his good behavior in prison, the love of his family and

friends, his daughter's forgiveness for having killed her mother, his remorse, the unlikelihood that he will ever be released from prison if sentenced to a life term, and his advanced age. We will discuss each of these and other factors in turn.

### 1. Family Background

{¶ 83} Davis's mother (Alluster Tipton), stepfather (Charles Tipton), and two siblings (Victor L. Davis and Carol Smith) testified about Davis's childhood and early family life. Davis was born in 1946. His parents, Nicholas and Alluster Davis, were married in 1945. They had five children together: Elliot, Von, Carol, and Victor Davis, and another child who died as an infant. During their marriage, Alluster testified, Nicholas "was in and out" of the household. Carol Smith and Victor Davis testified that Nicholas left home when they were very young and that they had only vague memories of him. Alluster testified that Nicholas's drinking caused problems in their marriage.

{¶ 84} When Von was nine or ten years old, his mother began dating Charles Tipton. They married in 1962 and were married at the time of the mitigation hearing in 2009. Tipton testified that he and Von were "very close" and went fishing together every weekend before Von went to prison, but that they never discussed "personal issues." Tipton considers Von a son rather than a stepson.

### 2. Borderline Personality Disorder and Alcohol Dependence

{¶ 85} Dr. Robert Smith, a defense-engaged clinical psychologist and certified addiction specialist, interviewed Davis twice. He interviewed Alluster and Charles Tipton, three of Davis's siblings, and Patrick Rotundo, Davis's lifelong friend. Dr. Smith also reviewed interviews conducted by investigators, school and medical records, police reports, and evaluations by other experts. Based on the above, Dr. Smith compiled what he described as a "comprehensive psychosocial history" of Davis.

**{¶ 86}** Dr. Smith formed the opinion that Davis suffered from two psychological disorders—alcohol dependence and borderline personality disorder—when he murdered Butler. In Dr. Smith's opinion, these disorders "interfered with his cognitive functioning" and "impaired or diminished his ability at the time of the offense." Dr. Smith explained that borderline personality disorder is correlated with backgrounds characterized by an extreme lack of adequate parental supervision and nurturing. As a result, "these individuals * * * don't develop a sense of themselves."

**{¶ 87}** According to Dr. Smith, Davis's father was 16 years old and his mother was 17 years old when they married in 1945. They were "volatile and angry with one another and had lots of fights and arguments" and "numerous separations" during their marriage of about nine years. Nicholas Davis was an alcoholic, unfaithful to his wife, and verbally abusive to his wife and children. During his marriage to Alluster, he was "basically * * * absent." He disappeared for significant periods and did not support his family while absent. Davis had no contact with his father from age 12 until he reached adulthood, when Davis impulsively went AWOL from the Navy to visit Nicholas.

**{¶ 88}** Alluster was often away from home herself, leaving her children in the care of her mother and aunt. When Nicholas was absent, she engaged in a series of relationships with other men. According to Dr. Smith, Alluster had three children by three different men in addition to the children she had by Nicholas. These relationships were brief; two of them lasted for a year each, and one lasted for three years. She also "abused alcohol occasionally."

**{¶ 89}** There was no bond between Davis and his parents, and he had no experience of "love, nurturing or intimacy" during his early years. Dr. Smith explained that young children rely on parents to set boundaries and teach values. Nicholas and Alluster "had significant problems that prevented them from being

able to be there" for Davis. They failed to provide "consistency" for Davis as he was growing up.

{¶ 90} In 1962, Alluster married Charles Tipton. Dr. Smith stated that Tipton "was the one hope that [Davis] had" for stability, "but it came too late." By the time Tipton married Alluster, Davis had largely formed his personality. Davis had already begun abusing alcohol and "running the streets" rather than spending time at home.

{¶ 91} Dr. Smith observed that Davis displayed classic symptoms of borderline personality disorder. These included a pattern of "unstable, intense relationships"; impulsivity; inappropriate, intense anger; depression; "[t]ransient, stress-related paranoid ideation"; identity disturbance; and a lack of a "sense of direction." Dr. Smith defined a "personality disorder" as a "personality style" that causes a person to act in "self-defeating" ways. He explained that borderline personalities "need relationships * * * desperately and * * * are very frightened of losing what relationships they have." They tend to "idealize" others and expect too much of others. Yet they also tend to misinterpret situations and to suspect the motives of others. Thus, they experience "dramatic mood swings" between "idealizing you" and "wanting to push you away." Because they lack "coping strategies" for stress, borderline personalities overreact to minor provocations. They engage in outbursts of disproportionate anger and "unwarranted aggressive behavior."

{¶ 92} Dr. Smith also noted that Davis had indicated that he had "consumed some amount of beer and hard liquor" before killing Butler. Dr. Smith testified that intoxication, like borderline personality disorder, can distort one's perceptions and cause impulsivity and mood swings. Thus, there is a "synergy between" alcohol dependency disorder and borderline personality disorder, and a person with both disorders "is more impaired than if they had the one disorder alone."

### 3. Good Behavior in Prison

{¶ 93} Scott Nowak, a "correctional program specialist" at the Ohio State Penitentiary in Youngstown, worked with death-row inmates and other inmates who had the highest security classification. He testified that Davis had been living on the death row "honor block" since May 2006. He also testified that a death-row inmate had to go 36 months without committing a major rule violation to be placed on the waiting list for the honor block.

{¶ 94} Jerome Stineman, a volunteer in the Alcoholics Anonymous ("AA") program at the Southern Ohio Correctional Facility when Davis was an inmate there, had known Davis since 1989 or 1990. Stineman testified that Davis had participated in AA meetings every week for approximately three years from 1990 to 1993.

{¶ 95} Dr. Smith testified that Davis had shown that "within the institution he does well." Dr. Smith testified that people with a borderline personality usually "do very well in a structured environment." He explained that the borderline personality has problems with "impulsivity [and] poor decision making and difficulty with relationships." Dr. Smith testified that in prison, the inmate has "clear-cut rules," supervision "at all times," few decisions to make, and few opportunities to "act out" or form relationships. Moreover, an alcohol-dependent inmate has a "greatly reduced" likelihood of access to alcohol in prison.

### 4. Love of Family and Friends; Forgiveness of Daughter

{¶ 96} Charles Tipton testified: "Growing up, [Davis] was a child that every parent would want to have. Never a day in trouble." Davis's mother, brother, and sister each testified that they had maintained their relationships with Davis with visits, phone calls, and letters. Each stated that Davis was meaningful and important to them, and each asked the panel to spare his life. Victor Davis said that Von had had "a spiritual awakening" while incarcerated. Carol Smith considered him "a good person deep inside."

{¶ 97} Fran Welland of London, England, testified that she had been corresponding with Davis since 1992, had exchanged hundreds of letters with him in that time, and had visited him three times since 1996. She described Davis as "open and generous with his feelings" and not manipulative. She praised his sense of humor and testified that his execution would "tear [her] apart."

{¶ 98} Sherry Davis is the daughter of Von Davis and Ernestine Franklin Davis, whom Davis murdered in 1970. Sherry had felt hatred toward her father for a long time, but she forgave him because she did not want to carry that burden through life. Since then, she had formed a strong bond with him. She had visited him, corresponded with him, and spoken to him on the telephone. She stated, "I would not like to see my father taken away from me as well."

5. Remorse and Acceptance of Responsibility

{¶ 99} Fran Welland testified that in a recent letter to her, Davis had expressed remorse for having killed two people. Victor Davis testified that Davis had always expressed remorse to him and had never denied responsibility or blamed anyone except himself for Butler's murder. Dr. Smith testified that Davis admitted that he had killed Butler and that he had been "dishonest" when he had denied guilt at his trial in 1984. Dr. Smith testified that Davis clearly stated at their first meeting "that he had no * * * desire to excuse what he did" and also stated that "he was going to acknowledge that and own that completely."

6. Unlikelihood of Release

{¶ 100} The defense called as a mitigation witness Cynthia Mausser, the chair of the Ohio Parole Board. Mausser explained how the parole board determines whether to grant or deny parole. When considering release, the board will order a "clinical risk assessment," which includes an interview with the prisoner by a "psychology assistant," a file review, and an assessment of whether 24 "risk factors" are present. The resulting report is approved by a supervising psychologist. The board also considers the seriousness of the offense and the

inmate's criminal history and history of parole violations. Mausser testified that the average time served for an aggravated-murder conviction is about 27 years.

{¶ 101} Defense counsel asked Mausser to assume the facts of this case and asked whether she had "an opinion of whether that individual is likely to be paroled in the future." Mausser testified that in her opinion, "that person * * * would likely spend a large portion of the remainder of their life in prison" and was unlikely to be paroled on his first appearance before the board. On cross-examination, Mausser testified that after an inmate's first review, he could come up for a new hearing every year and would be entitled to at least one hearing every ten years. Mausser conceded that she had never sat on a parole hearing for an inmate convicted of aggravated murder with death specifications who received a life sentence. She further testified that the amount of weight to give any particular factor was within the discretion of each individual board member and that she could not say with certainty how the board would vote if Davis ever became eligible for parole.

### 7. Cost of Life Imprisonment vs. Cost of Death Row

{¶ 102} At his resentencing hearing, Davis asked the sentencing panel to take into account that it is more expensive to hold a person on death row than to imprison him for life. Defense witness Scott Nowak testified that inmates transferred off death row are generally transferred to "Level 3 security institutions." These institutions have a lower officer-to-inmate ratio than the penitentiary at Youngstown, where Nowak worked and where death row was located at the time of the hearing.

### 8. Evidence from the 1984 Mitigation Hearing

{¶ 103} At his 1984 mitigation hearing, Davis had called four witnesses. Alluster and Charles Tipton gave testimony consistent with their 2009 testimony. Charles Tipton also stated that Davis had been honorably discharged from the Navy.

{¶ 104} John Bohlen of the Adult Probation Department of the Butler County Court of Common Pleas testified that Davis's prison record from his 1971 conviction showed no significant disciplinary problems. Davis had studied in prison, earning an associate's degree in business administration and three years' worth of credit toward a bachelor's degree from Urbana College. He had also been awarded a certificate in vocational training in auto-body repair and in masonry and had received on-the-job training as a dental technician. His record also showed that he had been diagnosed with compulsive personality disorder.

{¶ 105} Clinical psychologist Dr. Roger Fisher, the executive director of the Butler County Center for Forensic Psychiatry, testified about his interview with Davis before the 1984 mitigation hearing. He agreed with the diagnosis of compulsive personality disorder and with another diagnosis of Davis as an "active-detached individual with schizoid trends." Based on Davis's vocational history, Dr. Fisher described him as "quite * * * hard working" and "very dedicated to doing a good job for people who employ him."

## C. Weighing

{¶ 106} The mitigating factors that Davis emphasized most strongly during his mitigation hearing were his dysfunctional family background and the personality disorders allegedly caused by that background. These factors, although relevant here, are entitled to little weight.

{¶ 107} Dr. Smith testified that the symptoms of borderline personality disorder include dramatic mood swings, impulsivity, and outbursts of disproportionate anger. The murder of Suzette Butler, however, was not an impulsive act or the product of an angry outburst. The trial court found Davis guilty of killing Butler with prior calculation and design. Several hours before the murder, Davis used a straw purchaser to acquire a gun and ammunition, making three trips to various stores to accomplish the purchases. Aldridge, Denmark, and

Massey testified that Davis did not appear to be arguing or fighting with Butler immediately before the murder.

{¶ 108} In *State v. Raglin*, 83 Ohio St.3d 253, 270-273, 699 N.E.2d 482 (1998), a defense expert testified that the defendant suffered from several psychological and neuropsychological disorders, including borderline personality disorder. The expert further testified that the defendant suffered from a "lack of impulse control" that deprived him of substantial capacity to conform to the law. *Id*. at 273. We determined that this factor deserved "limited weight." *Id*. "[P]erhaps [the] most important" reason for our conclusion was that "the nature and circumstances of the offense clearly indicate a lack of impulsive behavior in the planning and execution of the robbery, in the killing that occurred during the robbery, or in appellant's actions immediately following the robbery and killing." *Id*.

{¶ 109} Evidence at trial indicated that Davis had consumed alcohol on the day of the murder. This is entitled to at least some weight as a mitigating factor. The record does not make clear how much alcohol Davis drank that day. In any event, this court has held that voluntary intoxication deserves little weight in mitigation. *State v. Campbell*, 95 Ohio St.3d 48, 51, 765 N.E.2d 334 (2002).

{¶ 110} Davis retains the love and support of his family and friends. This is entitled to some weight. So are his honorable naval service and his vocational history. The fact that his daughter Sherry forgave him for murdering her mother deserves little if any weight. Sherry testified that she forgave Davis in order to further her own healing. Her forgiveness does not necessarily reflect anything favorable in Davis's history, character, or background.

{¶ 111} We afford no weight to the testimony of the chair of the parole board regarding the likelihood of parole for a person in Davis's situation who does not receive a sentence of death. This testimony was speculative. Even she could not predict how her fellow board members might vote. Nevertheless, given

his age (67), the likelihood that Davis will never be released from prison is credible enough to deserve some weight. *See State v. Bradley*, 42 Ohio St.3d 136, 149, 538 N.E.2d 373 (1989) (court should consider probability that defendant will never be released from prison).

{¶ 112} Davis established that he had a record of good behavior in prison, both during his earlier incarceration and on death row. This is relevant mitigation, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 , 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and is entitled to some weight.

{¶ 113} "Retrospective remorse" is entitled to little weight. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 119; *State v. Post*, 32 Ohio St.3d 380, 394, 513 N.E.2d 754 (1987).

{¶ 114} The allegedly lower cost of life imprisonment compared to imposition of the death penalty is not a legitimate mitigating factor. Relevant mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). "Evidence of cost effectiveness of the death sentence does not bear on a defendant's character, prior record or the circumstances of the offense." *Al-Mosawi v. State*, 929 P.2d 270, 287 (Okla.Crim.App.1996). Moreover, "[o]nce the legislature has resolved to create a death penalty that has survived constitutional challenge, it is not the place of this or any court to permit counsel to question the * * * economic wisdom of the enactment." *Johnson v. State*, 660 So.2d 637, 646 (Fla.1995). *See State v. Kayer*, 194 Ariz. 423, 440, 984 P.2d 31 (1999); *State v. Clark*, 851 So.2d 1055, 1083-1084 (La.2003); *State v. Brown*, 902 S.W.2d 278, 295 (Mo.1995).

{¶ 115} Finally, we find no mitigating features in the nature and circumstances of the offense, which was both calculated and brazen.

**{¶ 116}** The aggravating circumstance here, the prior conviction of murder, is one that this court has described as "very strong," *State v. Taylor*, 78 Ohio St.3d 15, 34, 676 N.E.2d 82 (1997), and "significant," *State v. Carter*, 64 Ohio St.3d 218, 228, 594 N.E.2d 595 (1992). "A prior murder conviction can be even more grave than other aggravating circumstances." *Taylor* at 34. The mitigating factors are not strong. We conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

### D. Proportionality

**{¶ 117}** We have approved death sentences in cases in which the prior-murder-conviction specification under R.C. 2929.04(A)(5) was the sole aggravating circumstance presented. *Taylor*; *State v. Mapes*, 19 Ohio St.3d 108, 484 N.E.2d 140 (1985).

### VI. Conclusion

**{¶ 118}** For the foregoing reasons, we affirm the judgment of the court of appeals, affirming Davis's sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., concurs in affirming the conviction and dissents as to the sentence, for the reasons stated in his dissenting opinion in *State v. Wogenstahl,* 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

Laurence E. Komp and John P. Parker; and Midwest Center for Justice, Ltd., and Alan M. Freedman, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael A. Oster Jr., Chief, Appellate Division, for appellee.

_____