[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brinkman*, Slip Opinion No. 2022-Ohio-2550.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2550

THE STATE OF OHIO, APPELLEE, *v*. BRINKMAN, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brinkman*, Slip Opinion No. 2022-Ohio-2550.]**

*Criminal law—Aggravated murder—Findings of guilt and death sentences affirmed—Trial court's judgment imposing postrelease control on counts that were merged with other counts reversed, and cause remanded to the trial court for it to vacate improperly imposed postrelease control.*

(No. 2019-1642—Submitted November 10, 2021—Decided July 28, 2022.)

APPEAL from the Court of Common Pleas of Stark County, No. 2018CR1994.

————————————

**DEWINE, J.**

{¶ 1} This is a direct appeal in a capital case.  George Brinkman murdered Rogell ("Gene") and Roberta ("Bobbi") John in their home upon their return from vacation.  Brinkman waived his right to a jury trial and entered guilty pleas to the charges against him.  A three-judge panel found Brinkman guilty of two counts of aggravated murder and sentenced him to death on each count.  We affirm his convictions and death sentences.

{¶ 2} But we conclude that the trial court erred by imposing postrelease control with respect to Brinkman's convictions for aggravated robbery and aggravated burglary, since those counts were merged with the aggravated-murder convictions for purposes of sentencing. We therefore reverse the trial court's judgment imposing postrelease control as to the aggravated-burglary and aggravated-robbery counts, and we remand Brinkman's case to the trial court with instructions for it to vacate the improperly imposed postrelease control.

## I. BACKGROUND

### A. The Johns' bodies are discovered

{¶ 3} The John family had known Brinkman for some time. According to Gene's son, Jason, the family met Brinkman a decade earlier when Brinkman started dating Jason's half-sister. After that relationship ended, Brinkman continued to work for a company co-owned by Jason and Gene and spent some holidays with the John family.

{¶ 4} In June 2017, Brinkman house- and dog-sat for the Johns at their home in North Canton while they were away on vacation. The Johns were scheduled to return home on Sunday, June 11.

{¶ 5} The next day, Jason learned that Gene had not shown up for work. Unable to reach Gene or Bobbi, Jason called Brinkman, who told him that the couple had arrived home around 5:00 p.m. on Sunday. Brinkman told Jason that Bobbi had not been feeling well and had gone to lie down but that he had stayed and talked with Gene for a few hours before he left their house.

{¶ 6} After work, Jason went straight to the Johns' home, where he discovered their bodies in an upstairs bedroom. He called 9-1-1. Deputies from the Stark County Sherriff's Office reported to the scene. They found Gene's body on the bedroom floor, underneath a blood-soaked comforter with bullet holes in it. A black wallet lay on the floor near Gene's left hand. Bobbi's body was on the

bed, covered with a sheet. And there was a bloodstained pillow with bullet holes in it on the floor next to the bed.

### B. Brinkman is arrested and interviewed

{¶ 7} Jason gave the deputies Brinkman's cell-phone number and address. The deputies "pinged" Brinkman's phone to pinpoint its GPS location and then forwarded that information to the Brunswick and North Royalton police departments. North Royalton police tracked Brinkman down and took him into custody on June 13. That day, Stark County Deputy Sheriff Craig Kennedy interviewed Brinkman at the North Royalton police department. Brinkman denied having anything to do with the John murders.

{¶ 8} The next day, Deputy Sheriff Rick Stauffer and FBI Agent Andrew Earl interviewed Brinkman. Brinkman said that he housesat for the Johns during the past week while they were on vacation. He told the investigators that on the day the Johns were expected to return from vacation, he noticed an M1911 handgun in an open box on Gene's desk. He saw rounds nearby and put them into the clip and placed the clip into the gun. He then moved through the house, pointing and pretending to shoot the gun as he went. When he saw the Johns arrive home, he put the gun down and helped carry in their luggage.

{¶ 9} According to Brinkman, Bobbi "started yelling" at him soon after she walked into the house, and she accused him of neglecting the dog. While Bobbi and Brinkman were going at it, Gene spotted the gun and asked why it was out of its box. Brinkman grabbed the gun and told the Johns to "shut up." When the Johns continued yelling at him, Brinkman ordered them upstairs to the guest bedroom at gunpoint. (Brinkman said that he had picked that bedroom because it was farthest from the neighbors, who had a young child.)

{¶ 10} Brinkman ordered the Johns to sit on the bed. But when he turned to leave the room, he heard Gene get off the bed behind him. Brinkman turned back around and, in his telling, the gun just "went off," shooting Gene in the hip.

Although he had admitted to loading the gun, Brinkman claimed that he had not known that there was a round in the chamber.

{¶ 11} According to Brinkman, Bobbi started "freaking out" after he shot Gene, so he pointed the gun at her and told her to shut up. Brinkman threw a comforter to Gene to stop the bleeding and started hitting Bobbi on her head with the butt of the gun because she would not be quiet. When Gene tried to stand up, Brinkman shot him twice more. Brinkman then pushed Bobbi's head down onto the bed and continued to beat her with the butt of the gun. Bobbi kept screaming, so Brinkman covered her head with a pillow and shot her. He put pillows under Gene's body so that Gene "would be comfortable." But Bobbi was still making gurgling sounds and trying to talk, so Brinkman held a pillow over her face for five to ten minutes until she was quiet. He covered the two dead bodies with blankets.

{¶ 12} Brinkman took the four spent shell casings, the Johns' cell phones, and $140 in cash from their wallets. Before leaving the house, he showered and changed clothes. He later disposed of his bloody clothes, the cell phones, and the gun somewhere on I-77 or I-71.

### C. The autopsies

{¶ 13} Renée Robinson, a Stark County deputy coroner, performed autopsies on both victims. She concluded that gunshot wounds were the cause of death in each case. Blunt-force trauma to Bobbi's head and neck also contributed to her death.

{¶ 14} According to Dr. Robinson, two bullets struck Gene on the right side of his chest, one of which exited the left side of his body. A third bullet entered his "left flank" and was recovered in his "right buttock."

{¶ 15} Dr. Robinson determined that Bobbi had suffered gunshot wounds to the right side of her head and left shoulder. She also sustained multiple blunt-force injuries to her torso, left and right upper extremities, right foot, neck, and

head. One side of Bobbi's skull had been crushed, resulting in significant bleeding around her brain.

## II. TRIAL-COURT PROCEEDINGS

{¶ 16} Brinkman was charged in the Stark County Court of Common Pleas with six counts:

| Counts | Charges | Death Specifications | Other Specifications |
|---|---|---|---|
| 1 | Aggravated murder of Gene under R.C. 2903.01(B) (felony murder predicated on aggravated burglary and/or aggravated robbery) | Each count included a course-of-conduct specification under R.C. 2929.04(A)(5) and two felony-murder specifications based on the commission of aggravated burglary and aggravated robbery as the principal offender under R.C. 2929.04(A)(7). | Counts 1 through 5 each carried a firearm specification under R.C. 2941.145(A). |
| 2 | Aggravated murder of Bobbi under R.C. 2903.01(B) (felony murder predicated on aggravated burglary and/or aggravated robbery) | | |
| 3 | Aggravated burglary by trespass | | |
| 4 | Aggravated robbery of Gene | | |
| 5 | Aggravated robbery of Bobbi | | |
| 6 | Tampering with evidence | | |

{¶ 17} Brinkman initially pleaded not guilty, but he ultimately decided to waive his right to a jury trial and enter guilty pleas to every count in the indictment. The trial court accepted Brinkman's jury waiver and guilty pleas.

{¶ 18} Under Ohio law, after a three-judge panel accepts a guilty plea in a death-penalty case, the panel must conduct an evidentiary hearing to determine whether the defendant is guilty of aggravated murder or a lesser offense. R.C. 2945.06; Crim.R. 11(C)(3); *see also State v. Green*, 81 Ohio St.3d 100, 101, 689 N.E.2d 556 (1998). In this case, the parties presented the panel with a document titled "Stipulated Facts," which the court admitted into evidence. The panel confirmed that Brinkman understood the stipulation and its contents, as well as its legal effect. Additionally, the state presented four witnesses during Brinkman's plea hearing: two Stark County Sheriff's Office deputies, Gene's son Jason, and one of Gene and Bobbi's neighbors, Jeffrey Wagner. The panel found Brinkman guilty on all counts and specifications in the indictment.

{¶ 19} With respect to each of the two aggravated-murder counts, the panel merged the aggravating circumstances (aggravated burglary/principal offender) in the second death specification with the aggravating circumstances (aggravated robbery/principal offender) in the third death specification. The panel also found that Brinkman's separate convictions for aggravated burglary and aggravated robbery under Counts 3, 4, and 5 merged with his aggravated-murder convictions under Counts 1 and 2 for purposes of sentencing.

{¶ 20} The case then continued to the mitigation phase. At the mitigation hearing, Brinkman made an unsworn statement, offered the testimony of five witnesses, and presented documentary evidence. After deliberating, the panel sentenced Brinkman to death on both aggravated-murder counts, a concurrent 36-month prison term for the tampering-with-evidence count, and a consecutive six-year prison term for the firearm specifications. The court also imposed mandatory postrelease control for the aggravated-burglary and aggravated-robbery convictions and told Brinkman that he would be required to register with Ohio's Violent Offender Database pursuant to R.C. 2903.41 through 2903.44 ("Sierah's Law") if he were ever released.

## III.  INDICTMENT AND PLEA-HEARING ISSUES
### A.  Insufficient indictment

{¶ 21} We begin with Brinkman's eleventh proposition of law, in which he argues that a capital indictment is insufficient when it fails to state "the final and specific element necessary for a death sentence: that the aggravating circumstance(s) outweigh the mitigating factor(s) beyond a reasonable doubt."

{¶ 22} We have previously rejected the argument that the United States or Ohio Constitutions require that a capital indictment include an allegation that the aggravating circumstances outweigh the mitigating factors.  *See State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 125-128.  In *Sowell*, the appellant alleged, as Brinkman does here, that an allegation "that the aggravating circumstances outweigh the mitigating factors is 'the functional equivalent of an element' * * * of the capital offense, because a jury's determination that the aggravating circumstances outweigh the mitigating factors is required for a death sentence under Ohio law."  *Id*. at ¶ 125, quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), fn. 19.  We disagreed and held that when, as here, an indictment for capital charges tracks the language of R.C. 2903.01(A) or (B) and the death specifications track the language of R.C. 2929.04(A)(5) or (A)(7), the indictment satisfies all federal and state constitutional requirements.  *Sowell* at ¶ 128.

{¶ 23} On the authority of *Sowell*, we reject Brinkman's eleventh proposition of law.

### B.  Jury-waiver colloquy

{¶ 24} Next, we address Brinkman's tenth proposition of law, in which he asserts that the trial court's jury-waiver colloquy was inadequate, thereby denying him a fair trial and due process.

*1. Background*

{¶ 25} On the day Brinkman entered his guilty pleas, the presiding judge asked him whether he understood that by waiving his right to a jury trial, the panel would be the trier of fact and sentencer in his case. Brinkman affirmed that he wanted to waive a jury and signed a jury-waiver form.

{¶ 26} The panel then conducted a comprehensive guilty-plea colloquy. First, Brinkman assented that he was prepared to enter guilty pleas to all the offenses in the indictment. The court then went over each count and specification in the indictment. The panel also explained the procedure for a capital trial— including death-qualification voir dire, the burden of proof, the elements of the offenses, the mitigation phase, and the weighing process used to consider mitigation evidence—and it discussed the nature and circumstances of the offenses.

{¶ 27} The court presented Brinkman with the plea form that he had signed and read the form aloud to ensure that Brinkman understood the charged offenses, the potential penalties for each charge, and how certain offenses may be merged for purposes of sentencing. The court explained the maximum sentences for each noncapital count and addressed the additional consequences of being convicted on those counts.

{¶ 28} The panel also reviewed the stipulated facts and verified that Brinkman understood that the panel must consider those facts and admit the stipulated exhibits. The court explained that based on the stipulated facts, the panel most likely would find that Brinkman committed the aggravated murders and was guilty of the attached specifications. The court also indicated that it would permit Brinkman to withdraw his pleas if the panel, "after hearing the evidence," found that the facts did not support one or more of the aggravated-murder charges.

{¶ 29} Next, the panel discussed the constitutional rights that Brinkman would be waiving and ensured that Brinkman understood each right. At the conclusion of the colloquy, the panel determined that Brinkman had knowingly,

intelligently, and voluntarily waived his right to a jury trial and that he understood the nature of the offenses and the maximum penalties.

*2. Analysis*

**{¶ 30}** Brinkman argues that the trial court erred by failing to advise him that he could withdraw his plea at any time prior to the state's presentation of its case. But Brinkman fails to point to any procedural rule or statute that required the trial court to give that advisement. To be valid, a jury waiver under R.C. 2945.05 must meet five conditions: "It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 9. A written jury waiver creates a rebuttable presumption that the waiver was knowing, intelligent, and voluntary. *Id*. at ¶ 10.

**{¶ 31}** The trial court strictly complied with R.C. 2945.05. The court addressed Brinkman's request to waive his right to a jury in open court and verified that he had knowingly, intelligently, and voluntarily signed the jury waiver. The court filed the signed waiver with the clerk. Nothing more was required. *See State v. Jells*, 53 Ohio St.3d 22, 25-26, 559 N.E.2d 464 (1990) ("There is no requirement in Ohio for the trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial. The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel").

**{¶ 32}** Brinkman also argues that the trial court erred by failing to advise him that his jury waiver would negatively affect any appellate challenge to the trial court's evidentiary rulings. Brinkman acknowledges that we have rejected this and similar arguments in prior capital cases. *See State v. Baston*, 85 Ohio St.3d 418, 421-422, 709 N.E.2d 128 (1999) (confirming that the trial court is not required to engage in a thorough discussion of all the implications of a jury waiver). He urges

us to reconsider our decision in *Baston* and hold that a "trial court should inform a defendant prior to accepting his jury waiver of the ramifications for his appeal." We decline to do so, in line with our precedent. *See, e.g.*, *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 25-27 (noting "the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary" and rejecting the argument that "the trial court was required by the Constitution to ensure that [the defendant] understood that this presumption would be applied on appellate review if he waived a jury trial" [cleaned up]).

**{¶ 33}** We therefore hold that the trial court did not err in its jury-waiver colloquy and reject Brinkman's tenth proposition of law.

*3. Ineffective assistance of counsel during the jury-waiver colloquy*

**{¶ 34}** In his second proposition of law, Brinkman asserts that his defense counsel was ineffective for not objecting to the trial court's failure to tell him that he could withdraw his jury waiver at any time prior to the state's presentation of its case. To establish ineffective assistance, Brinkman must show that his counsel's representation was deficient and that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. As we explained above, the trial court complied with R.C. 2945.05, so defense counsel was not deficient for failing to object. We therefore reject Brinkman's claim of ineffective assistance regarding this issue.

### C. Gruesome photographs

**{¶ 35}** We turn now to Brinkman's third proposition of law, in which he challenges the admission of gruesome crime-scene and autopsy photographs during both the guilt and mitigation phases.

{¶ 36} Relevant evidence is generally admissible, Evid.R. 402, unless "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury," Evid.R. 403(A). And a court may exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

{¶ 37} Brinkman asks us to apply a heightened standard when reviewing the admission of gruesome photographs in a capital case, saying that such evidence is admissible *only* if its probative value outweighs its prejudicial impact and it is neither repetitive nor cumulative. *See, e.g.*, *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 96, citing *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987); *contra State v. Maurer*, 15 Ohio St.3d 239, 264-266, 473 N.E.2d 768 (1984) (applying Evid.R. 403). It is not necessary to decide here whether this court should apply the Rules of Evidence or a heightened standard when reviewing the admission of gruesome photographs in capital cases. Even under a heightened standard, we find no error in the trial court's decision to admit the photographs in question.

{¶ 38} Although the parties submitted written stipulated facts and exhibits prior to the plea hearing, defense counsel objected at the end of the hearing to 13 photographs included in the stipulations. The disputed photographs depict the bodies of Brinkman's victims at the crime scene and during the autopsies.

{¶ 39} At the plea hearing, the court sustained Brinkman's objection to one of the photographs, which appeared to show brain matter on the head of one of the victims, but it overruled his objections to the other photographs. In the mitigation phase, the state moved to readmit all the plea-hearing evidence. Defense counsel did not make any additional objections, and the trial court readmitted all but one of the previously admitted exhibits.

**{¶ 40}** "Balancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 30. Brinkman argues that the trial court abused its discretion when it admitted the challenged photographs because each had a prejudicial impact greater than its probative value. He also asserts that the photographs may have emotionally swayed the panel at sentencing. His arguments lack merit.

**{¶ 41}** Setting aside the fact that Brinkman stipulated to the exhibits, we note that only four of the admitted crime-scene photographs depict bloodstains, blood spatter, or the victims. These photographs appropriately showed the extent of the victims' injuries and their positions in the guest bedroom. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 103; *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 139-140. Brinkman argues that the photographs were unnecessary because the autopsy reports and death certificates were sufficient to establish the manner, mode, and cause of the victims' deaths, but that does not render them inadmissible. *See Mammone* at ¶ 99.

**{¶ 42}** The trial court did not abuse its discretion in admitting the challenged photographs. Finding no error, we reject Brinkman's third proposition of law.

### D. Proper procedure under R.C. 2945.06

**{¶ 43}** In his fourth proposition of law, Brinkman contends that the trial court erred to his prejudice when the presiding judge determined the admissibility of evidence during the plea hearing without the contemporaneous input of the rest of the panel.

**{¶ 44}** The presiding judge stated:

> [T]he case is considered complete at this point for purposes of the panel to recess and deliberate, so I will ask my colleagues to go ahead and recess for that purpose and I will join them in just a moment once I have determined which exhibits I will be bringing back with me to engage in our deliberations.

The presiding judge then released the other two judges and heard arguments for and against the admission of the evidence. As noted above, the presiding judge overruled the defense's objections as to 12 of the photographs but sustained its objection to an autopsy photograph that appeared to depict brain matter.

{¶ 45} Although Brinkman's proposition frames this issue as a constitutional one, he argues only that the court failed to strictly comply with R.C. 2945.06. But Brinkman did not object when the presiding judge indicated that she would rule on his objections to the exhibits without the rest of the panel. Thus, he has forfeited this claim, absent plain error. *See* Crim.R. 52(B); *Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, at ¶ 58 (a claim that a three-judge panel failed to follow the requirements of R.C. 2945.06 with respect to evidentiary rulings may be forfeited and, if so, the claim is subject to review for plain error). To prevail, Brinkman must show that an error occurred, that the error was plain, and that the error affected substantial rights—which we have interpreted to mean that the error affected the outcome of the trial. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{¶ 46} Brinkman has not made that showing. He does not contend that any of the exhibits were categorically inadmissible. Rather, he speculates that the other two judges *might* have found that the prejudicial impact of the photographs of the victims at the crime scene and during the autopsies outweighed their probative value and that absent that evidence, the panel *might* not have found him guilty. Yet he fails to explain how the exclusion of any of the challenged exhibits from the plea

hearing would have undermined the state's evidence on any of the elements of the offenses charged. Thus, Brinkman has not demonstrated a reasonable probability that the outcome of the proceeding would have been different had the entire panel ruled on his evidentiary challenges. We therefore reject his fourth proposition of law.

**{¶ 47}** And because Brinkman has not shown that he was prejudiced by the presiding judge's having ruled on his evidentiary objections without input from the other judges, we reject the ineffective-assistance claim raised in Brinkman's second proposition of law regarding counsel's failure to object to this procedure.

## IV. MITIGATION-PHASE ISSUES

### A. Prosecutorial misconduct

**{¶ 48}** In his first proposition of law, Brinkman argues that the state made multiple improper arguments during its mitigation-phase closing argument that collectively deprived him of a fair trial and due process. We disagree.

**{¶ 49}** "When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights." *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 115. Rooted as it is in the right to due process of law, a prosecutorial-misconduct claim requires us to analyze "whether the prosecutor's comments ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " *Id*., quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). " 'The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor.' " (Ellipsis added in *Kirkland*.) *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

*1. The prosecutor's arguments were supported by the evidence*

**{¶ 50}** Brinkman argued in mitigation that he murdered the Johns in a "spontaneous reaction" to their criticism of him. The state countered that the physical evidence and Brinkman's statements to police showed his plan to murder the Johns.

**{¶ 51}** Brinkman contends that the stipulated facts do not support the state's theory that his theft of the Johns' money and cell phones was the impetus for the murders. He maintains that the state improperly referred to facts outside the stipulations and that this prejudiced him because "the panel adopted the State's argument concerning the robbery in both its statements at sentencing and in its [sentencing] opinion."

**{¶ 52}** But the stipulated evidence included Brinkman's statements to police, which supported the state's theory. Moreover, Brinkman's argument that he spontaneously murdered the Johns is undermined by the physical evidence. Deputy Kennedy testified that the exterior handle of the guest-bedroom door appeared to have been either shot off or broken off. Investigators located a bullet fragment in the doorjamb and found the broken door handle on a stand inside the guest bedroom. When questioned by Deputy Stauffer, Brinkman said that he had no idea that the door handle had been broken and claimed that he had closed the door when he left the room. But Jason reported that the door handle was missing when he arrived and that he had to use his multi-tool to open the door.

**{¶ 53}** Brinkman's version of events did not account for that evidence. And based on that evidence, the state reasonably argued that the Johns had tried to lock themselves in the bedroom and that Brinkman shot off the handle to get inside the room. Brinkman has failed to show that the prosecutor's arguments were improper.

*2. The state did not convert the nature and circumstances of Brinkman's offenses into nonstatutory aggravating factors*

{¶ 54} In an attempt to explain why he had had Gene's gun out, Brinkman told police that he had just been "curious" about it. In his closing, the prosecutor argued that Brinkman's explanation was not credible and pointed out that Brinkman did not have to load the gun in order to "fiddle around and play with it." The trial court overruled the defense's objection, concluding that the prosecutor's argument was directed at the aggravated-robbery aggravating circumstance and was not improper. Brinkman contends that the prosecutor's argument converted the nature and circumstances of the murders into a nonstatutory aggravating factor and that he was prejudiced because the panel adopted the state's argument in its sentencing opinion.

{¶ 55} We have held that "counsel for the state at the penalty stage of a capital trial may introduce and comment upon (1) any evidence raised at trial that is relevant to the aggravating circumstances * * * [and] (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances * * * of which the defendant was found guilty." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. "[I]t is perfectly acceptable for the state to present arguments concerning the nature and circumstances of the offense. However, * * * it is wholly improper for the state to argue or suggest that the nature and circumstances of the offense are 'aggravating circumstances.'" (Emphasis deleted.) *State v. Wogenstahl*, 75 Ohio St.3d 344, 355, 662 N.E.2d 311 (1996), quoting R.C. 2929.04.

{¶ 56} The state's argument was fair comment on the evidence supporting the aggravating circumstances alleged in the indictment. At no point did the state argue that the nature and circumstances of the offenses were themselves aggravating circumstances. The prosecutor was within his discretion to argue that the aggravating circumstances outweighed the mitigating evidence, and he properly

incorporated facts relating to the offenses into his broader argument. *See State v. Smith*, 87 Ohio St.3d 424, 444, 721 N.E.2d 93 (2000) ("prosecutors may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance outweighs the mitigating factors").

*3. The state did not argue nonstatutory aggravating circumstances*

**{¶ 57}** Brinkman similarly contends that the prosecutor's references to the ages and professions of the victims during the state's mitigation-phase closing argument constituted an improper attempt to convert the statuses of the victims into aggravating factors supporting a death sentence.

**{¶ 58}** We disagree. The prosecutor's references to the ages of the victims and their careers—including Gene's status as a war veteran—did not imply that the victims' personal characteristics were aggravating circumstances. Rather, these facts were incorporated into the state's argument explicitly addressing the course-of-conduct and aggravated-burglary aggravating circumstances.

**{¶ 59}** Finding no prosecutorial misconduct, we reject Brinkman's first proposition of law. And because we conclude that no part of the prosecutor's mitigation-phase closing argument was improper, we also overrule Brinkman's claim in his second proposition of law that his counsel was ineffective for failing to object to the alleged instances of misconduct.

**B. Ineffective assistance of counsel during the mitigation phase**

**{¶ 60}** In his second proposition of law, Brinkman asserts that he was deprived of the effective assistance of counsel during the mitigation phase. He contends that his counsel did not adequately prepare for the mitigation hearing and should have retained a pharmacological expert to discuss the effects his medications had on him on the day of the murders.

**{¶ 61}** " 'Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the

penalty, including the defendant's background, education, employment records, mental and emotional stability, and family relationships.' " *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 219, *overruled on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, and quoting *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). Although "strategic choices made after thorough investigation of law and facts * * * are virtually unchallengeable[,] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674. But "[t]he decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997).

{¶ 62} Dr. Bob Stinson, a board-certified forensic psychologist who the defense retained for mitigation, testified that Brinkman had been taking Cymbalta and Gabapentin to treat his mental-health disorders and his pain caused by diabetes, and that his doses had been doubled shortly before the offenses. At the conclusion of Dr. Stinson's testimony, one of the judges inquired whether there were any side effects to Brinkman's medications that they should be aware of. Dr. Stinson responded that he did not "feel comfortable" answering that question because it was outside his expertise.

{¶ 63} Nothing in the record suggests that either of the medications had negatively affected Brinkman's mental health or decision-making. Thus, Brinkman's argument that defense counsel should have called an expert to testify about his medications is purely speculative. Moreover, the record does not indicate that defense counsel failed to investigate and consider the possibility of presenting additional mitigation evidence. It is Brinkman's burden to prove that counsel performed ineffectively, and this court will not "infer a defense failure to

18

investigate from a silent record." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

{¶ 64} We therefore reject Brinkman's claim of ineffective assistance based on his counsel's performance during the mitigation hearing.

### C. Sentencing hearing and sentencing opinion

{¶ 65} In his fifth proposition of law, Brinkman contends that the three-judge panel erred in determining that the aggravating circumstances outweighed the mitigating factors. Brinkman alleges that the panel improperly relied on contradictory facts and nonstatutory aggravating circumstances and that this prejudiced him by making "the robberies and murders part of an orchestrated plan as opposed to his spontaneous reaction to the owner's criticism[,] which was his theory in mitigation."

{¶ 66} But as we explained above, the evidence supported the state's theory that Brinkman's intent was to murder the Johns for their money. Brinkman's statements and the physical evidence show that the Johns attempted to lock themselves in the guest bedroom and that Brinkman shot the door handle off to get in. Once in the bedroom, Brinkman shot Gene three times and bludgeoned, shot, and suffocated Bobbi before stealing the couple's cell phones and cash.

{¶ 67} Brinkman also generally argues that the three-judge panel erroneously discounted his mitigating evidence. To the contrary, the panel's sentencing opinion demonstrates that it considered all the mitigating evidence submitted by Brinkman, including Dr. Stinson's report and his conclusions that Brinkman had suffered from multiple untreated mental-health disorders. Moreover, any error in assigning weight to any of the mitigating factors may be cured during our independent analysis of Brinkman's death sentences. *See Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 155.

{¶ 68} Based on the foregoing, we reject Brinkman's fifth proposition of law.

## V. CHALLENGES TO THE SENTENCE

### A. Lethal injection

#### 1. United States Constitution

**{¶ 69}** In his seventh proposition of law, Brinkman contends that his death sentences are invalid under the Eighth and Fourteenth Amendments to the United States Constitution because the state is unable to comply with the constitutional requirements to execute a capital defendant.

**{¶ 70}** To prevail on an Eighth Amendment method-of-execution claim, the defendant must establish that the method presents a risk that is "sure or very likely to cause serious illness and needless suffering" and gives rise to "sufficiently imminent dangers." *Glossip v. Gross*, 576 U.S. 863, 877, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015) (cleaned up). Upon making the first showing, the defendant must also identify "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.' " (Brackets added in *Glossip*.) *Id*., quoting *Baze v. Rees*, 553 U.S. 35, 52, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

**{¶ 71}** Brinkman's argument relates to the first question—whether Ohio's lethal-injection protocol presents a substantial and objectively intolerable risk of serious harm. *See id*., citing *Baze* at 50. He contends that the initial injection of the 500-miligram dose of Midazolam itself causes pain and that the Midazolam fails to adequately anesthetize the inmate prior to the injection of two other drugs known to cause pain. The United States Court of Appeals for the Sixth Circuit recently rejected a similar argument and upheld Ohio's lethal-injection protocol, concluding that there was no evidence establishing that the three-drug protocol was " 'sure or very likely' to cause serious pain" in the constitutional sense. *In re Ohio Execution Protocol*, 946 F.3d 287, 290-291 (6th Cir.2019), quoting *Glossip* at 877. The record in this case does not compel a different result. Moreover, Brinkman has not argued that there is a feasible alternative method of execution, which is required

to sustain an Eighth Amendment challenge to a method of execution. *See Glossip* at 877.

{¶ 72} As additional support for his claim that Ohio's lethal-injection procedure is unconstitutional, Brinkman refers to prior instances of prolonged or abandoned execution attempts by the state. But he cites only one such event since Ohio's adoption of the current protocol and otherwise fails to establish that that isolated incident demonstrates an objectively intolerable risk of harm with respect to his own sentence. *See Baze* at 50.

{¶ 73} Accordingly, we reject Brinkman's Eighth Amendment claim.

### 2. Ohio Constitution

{¶ 74} Article I, Section 9 of the Ohio Constitution provides, "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted." This court has held that the Ohio Constitution is a "document of independent force." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993). Brinkman has failed to advance any argument based on the unique text, structure, and history of the Ohio Constitution to establish that his sentence violates Article I, Section 9. Thus, we overrule Brinkman's seventh proposition of law.

### B. Ohio's Violent-Offender Registry

{¶ 75} In his ninth proposition of law, Brinkman contends that the statutes requiring him to register with Ohio's Violent Offender Database (Sierah's Law) are unconstitutionally retroactive. We recently rejected this argument in *State v. Hubbard*, 167 Ohio St.3d 77, 2021-Ohio-3710, __ N.E.3d __ (plurality opinion), and thus we have little difficulty overruling Brinkman's ninth proposition of law. We likewise reject the ineffective-assistance claim raised in Brinkman's second proposition of law regarding counsel's failure to object to the trial court's application of Sierah's Law.

### C. Improper imposition of postrelease control

**{¶ 76}** Brinkman contends in his eighth proposition of law that the trial court erred by imposing postrelease control for his aggravated-burglary and aggravated-robbery convictions. We agree.

**{¶ 77}** Although Brinkman was convicted on all counts in the indictment, the trial court merged Counts 3, 4, and 5 (aggravated burglary and aggravated robberies of Gene and Bobbi) into Counts 1 and 2 (aggravated murders of Gene and Bobbi) for sentencing purposes. Consequently, the court did "not impose additional sentence[s] on Count Three, Count Four, or Count Five." But in its sentencing opinion, the trial court did impose postrelease control for Counts 3 through 5.

**{¶ 78}** "[W]hen a trial court concludes that an accused has in fact been found guilty of allied offenses of similar import, it cannot impose a separate sentence for each offense." *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 28, *overruled on other grounds*, *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776. Thus, a trial court may not sentence a defendant on merged counts, and that includes the imposition of postrelease control on those counts. Therefore, we remand Brinkman's case to the trial court with instructions for it to correct the sentencing entry by deleting the paragraphs imposing postrelease control for Counts 3, 4, and 5. *See State v. Ortiz*, 2016-Ohio-4813, 68 N.E.3d 188, ¶ 10 (7th Dist.). By doing so, we render moot Brinkman's claim in his second proposition of law that his defense counsel was ineffective for failing to object to the improper imposition of postrelease control.

### D. Constitutional challenges to Ohio's death-penalty statutes

**{¶ 79}** In his sixth and twelfth propositions of law, Brinkman raises multiple constitutional challenges to Ohio's death-penalty statutes and asserts that they violate international law and treaties. We have repeatedly rejected the same arguments in other cases. *See State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-

1462, 108 N.E.3d 56, ¶ 21; *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 80-81; *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-110, 112-113, 116-120; *State v. Jenkins*, 15 Ohio St.3d 164, 168-173, 473 N.E.2d 264 (1984). We therefore summarily overrule Brinkman's sixth and twelfth propositions of law. *See State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 82, 521 N.E.2d 800 (1988).

**{¶ 80}** We likewise reject Brinkman's claim that his counsel was ineffective for failing to object to the constitutionality of Ohio's death-penalty procedures on these settled grounds. And having found no instances of ineffective assistance of counsel, we overrule Brinkman's second proposition of law in its entirety.

### E. Cumulative error

**{¶ 81}** In his thirteenth proposition of law, Brinkman argues that this court should reverse his convictions and death sentences because error pervaded the trial proceedings. Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. We have found only one error—the trial court's imposition of postrelease control for counts that had been merged for sentencing. Thus, the doctrine of cumulative error does not apply to this case, and we overrule this proposition of law.

### VI. INDEPENDENT SENTENCE EVALUATION

**{¶ 82}** Under R.C. 2929.05, this court has a duty to independently review Brinkman's death sentences. We must determine whether the evidence supports the panel's findings of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentences are proportionate to those that have been affirmed in similar cases. R.C. 2929.05(A).

## A. Aggravating circumstances

**{¶ 83}** Brinkman pleaded guilty to two counts of aggravated murder. Each aggravated-murder count included three capital specifications: one under R.C. 2929.04(A)(5) (course of conduct involving the purposeful killing of two or more persons) and two under R.C. 2929.04(A)(7) (aggravated murder committed during aggravated burglary and during aggravated robbery). Before sentencing, the trial court merged the second capital specification (aggravated burglary) and the third capital specification (aggravated robbery) for each count of aggravated murder. Thus, as to both aggravated-murder counts, the panel considered two aggravating circumstances: course of conduct and aggravated murder committed during aggravated burglary.

**{¶ 84}** The evidence in the record overwhelmingly supports the panel's determination as to the course-of-conduct specifications. The victims, a married couple, were shot at close range in the same room as part of a single episode. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (course-of-conduct aggravating circumstance requires a "factual link" between the murders).

**{¶ 85}** The evidence also supports Brinkman's convictions as the principal offender in carrying out the aggravated murders while committing or fleeing immediately after committing aggravated burglary. *See* R.C. 2929.04(A)(7). Brinkman's own statements to police indicate that he remained in the Johns' home after they returned from vacation and that he ordered them to the guest bedroom at gunpoint. The physical evidence and the statements that Brinkman made to police support a finding that he intended to murder the Johns and had planned to rob them so that he could leave town.

## B. Mitigating evidence

**{¶ 86}** We must weigh the aggravating circumstances discussed above against any mitigating evidence concerning "the nature and circumstances of the

offense" and Brinkman's "history, character, and background." *See* R.C. 2929.04(B). We must also consider and weigh any evidence of the mitigating factors outlined in R.C. 2929.04(B)(1) through (7).

**{¶ 87}** In mitigation, Brinkman presented his own unsworn statement, the testimony of five witnesses, and other documentary evidence.

*1. Brinkman's unsworn statement*

**{¶ 88}** Brinkman made the following unsworn statement:

I and I alone was responsible for what happened to Gene and Bobbi. They were extremely kind, caring and wonderful people who did not deserve to be killed by me. And to make things even worse, I lied to Jason and he ended up finding [the bodies]. That's horrible and [i]nexcusable.

I'm so very sorry for all the pain and suffering I have caused the families and friends of Gene and Bobbi. I know that will never be enough but it's all I have.

* * *

I'm not going to sit here and ask for mercy. Honestly, I do not deserve it. I deserve the maximum penalty allowed and that's the death penalty. There should be absolutely zero doubt about that.

In this case the aggravating circumstances do far outweigh any possible mitigating factors.

* * *

[T]his is about justice being served, and anything less than a sentence of death would not be justice. The family deserves that justice; that's all that matters now.

*2. History, character, and background*

{¶ 89} Most of the evidence about Brinkman's history, character, and background came from the testimony of forensic-psychologist Dr. Stinson and from Brinkman's exhibits. Based on his evaluation of Brinkman, Dr. Stinson suggested that 15 significant mitigating factors applied. We have combined some of Dr. Stinson's proposed mitigating factors for purposes of our review.

{¶ 90} Brinkman's parents are Barbara Brinkman Leon and George Brinkman Sr. Barbara gave birth to Brinkman in 1972, when she was about 17 years old. She subsequently had another son, Steven. Barbara reportedly smoked and drank alcohol even after she found out about her pregnancies.

{¶ 91} George Sr. was a truck driver and was gone most of the time. But when George Sr. was home, he reportedly drank heavily and physically and emotionally abused Brinkman and his mother and brother. One of Brinkman's earliest memories is of his parents, aunts, and uncles "sitting around and smoking pot together." George Sr. gave Brinkman and his brother alcohol when they were young and took them to bars.

{¶ 92} George Sr. called Brinkman's mother a "worthless bitch" and a "whore" in front of the children. George Sr. demanded that Barbara be subservient to him, "diminish[ed] [the family] as humans," and threatened that they were all replaceable. Brinkman would often "hear yelling and screaming and noises and then his mom crying."

{¶ 93} Brinkman recalled one day when his father was drunk and pointed a gun at him, his brother, and his mother and "told them that they had to close their eyes and he was going to shoot one of them and kind of went through the eenie meenie miney mo and then clicked an empty gun." Dr. Stinson opined that Brinkman was "obviously emotionally tormented during that process believing that one of them might in fact be * * * shot while the dad was drunk and * * * doing that."

{¶ 94} When Brinkman was about eight years old, Barbara left George Sr., taking Brinkman and his brother with her. But for the next 18 months, George Sr. tormented and "chase[d] after the family—one time following them right into a police station." Barbara and her sons "spen[t] time * * * in shelters and even [went as far as] California in an attempt to escape." Brinkman said the day that his mother left George Sr. was one of the happiest days of his life.

{¶ 95} When Brinkman was 19, Barbara allegedly kicked him out of the house because she believed that he was using drugs. Brinkman came home to find two black garbage bags filled with his belongings "waiting outside for him." Barbara reportedly had changed the locks and left Brinkman a note that said, "That's what you get for doing drugs." Brinkman admitted that he drank alcohol often during that period but said that he had not been using drugs.

{¶ 96} When he was in high school, Brinkman began dating Susan Kruse, who he claimed "corrupted" him. Brinkman dropped out of school during his junior year but later received his GED. Brinkman and Kruse had an on-again/off-again relationship for years, and in 1991, she became pregnant with their son. Brinkman moved in with Kruse, which he said was a mistake. Brinkman had wanted to break the cycle of poor relationships between fathers and sons in his family and had hoped that he and his son would be closer than he was to George Sr. But Brinkman acknowledged that that had not worked out; he is estranged from his son.

{¶ 97} Barbara later married Jimmy Leon. Leon was mean, sexist, and critical of Brinkman. But in Brinkman's view, Leon was better than his biological father because Leon did not beat Brinkman's mother.

{¶ 98} Barbara and Leon stayed married until her death from a terminal illness in 2013. Barbara's treating physicians had initially told Brinkman that she would likely recover, but shortly thereafter they said her disease was terminal. According to Dr. Stinson, Barbara's death put Brinkman through more of an emotional roller coaster than many who suffer the loss of a parent. In addition,

Barbara's death "created additional conflict and tension and * * * ultimately a separation between [Brinkman] and his stepfather." Brinkman resented Leon for failing to consult with him about his mother's funeral arrangements.

{¶ 99} Brinkman's brother committed suicide in 2015.

### 3. Military history

{¶ 100} When Brinkman was around 19 years old, he enlisted in the United States Army. Dr. Stinson noted that on Brinkman's enrollment forms, Brinkman said that "he needed structure and he needed discipline and he wanted self-control." This was a pivotal time in Brinkman's life. Dr. Stinson opined that the military "had high potential to kind of extract him from this traumatic childhood and maybe get him moving in the right direction." But Brinkman was injured almost immediately after joining and was released from his service. Brinkman indicated that he had wanted to return to the Army after he recovered, but he never reenlisted.

### 4. Brinkman's marriage and relationships

{¶ 101} Margaret ("Peggy") Berry met Brinkman in an internet chat room in 2001 and, after a few months, they met in person. In 2004, Brinkman and Peggy married. Peggy testified that Brinkman had never physically abused her, though he would "get a little moody if things didn't go his way." According to Peggy, Brinkman had been "best friends" with his mother. Brinkman's stepfather, Leon, was critical of Brinkman and made sexist remarks toward Peggy in Brinkman's presence. Leon told Peggy that she should be with him instead of Brinkman, and he asked Peggy out on dates while she was married to Brinkman.

{¶ 102} Peggy had multiple miscarriages during her marriage to Brinkman. A doctor informed Peggy that prior physical abuse was the cause of the miscarriages, and that news was hard on Brinkman. According to Peggy, Brinkman had wanted to be a father and did not want to see Peggy hurting.

{¶ 103} Peggy and Brinkman divorced in 2007. Peggy later learned that Brinkman had been diagnosed with diabetes and was homeless. Peggy said that

although she was not close with Brinkman when his mother died or when his brother committed suicide, she knew that "it crushed him."

{¶ 104} Carole Bialoskurski had been friends with Brinkman since high school, when they had a brief romantic relationship. Carole testified that Brinkman was "generous, kind, and fun to be around" and that he never abused her. Carole and Brinkman lost touch after high school and then reconnected in 2016. She testified that when she saw Brinkman in 2016, after his diabetes diagnosis, his appearance had changed a lot; he had become very thin, his face was drawn, and he told Carole that he was depressed.

{¶ 105} Jack Holt met Brinkman in grade school, they were in Cub Scouts together, and they remained friends throughout high school. Holt testified that he and Brinkman lost contact for a time but rekindled their friendship in 2015. Holt had heard about Brinkman's homelessness, so he gave Brinkman gas money and asked whether he wanted to apply for a maintenance position with the company Holt worked for. Brinkman never applied for the job, but in 2015 and 2016, Brinkman visited Holt's house frequently and helped him build a deck in his back yard.

{¶ 106} According to Holt, Brinkman was depressed after losing his mother. Holt was concerned that Brinkman would try to hurt himself given "everything that had been taking place with his family and [his] not being able to find a real job or an actual real home to stay at." So Holt talked Brinkman into going to the Nord Center, which provided behavioral-health services in Lorain County. Brinkman had an initial evaluation at the Nord Center, but their services were not covered under his Medicaid plan. Holt did not know whether Brinkman had followed the Nord Center's recommendation that he contact a similar agency in Cuyahoga County.

*5. Brinkman's medical condition*

{¶ 107} Brinkman was diagnosed with "ruptured discs" in 2008 and was eventually diagnosed with "spinal canal stenosis," which required him to manage the resulting pain.

{¶ 108} In 2015, Brinkman was diagnosed with "uncontrolled and untreated diabetes" and an aortic aneurysm. Dr. Stinson testified that Brinkman's diabetes was "pretty severe." He explained that "[e]rratic insulin levels can have intense effects on one's mood, can cause blackouts, can affect thoughts, feelings and behaviors," and because Brinkman's condition had been uncontrolled for so long, he had "exhibit[ed] some erratic behaviors [that] resembled symptoms that you would see in bipolar disorder but [they were] probably attributable to the diabetes." Brinkman experienced chronic neuropathic pain because of his diabetes, and he was prescribed multiple pain medications in 2015 and 2016. But none of these medications provided relief to Brinkman, and he eventually stopped taking them.

{¶ 109} Brinkman started taking Gabapentin for pain again in April 2016. In March 2017, a few months before the offenses in this case, Brinkman was prescribed Cymbalta to help alleviate his pain and treat his panic attacks. Brinkman's medical records indicate that the treating doctor was unsure whether Brinkman was experiencing panic attacks due to anxiety or because of his uncontrolled diabetes. Brinkman's prescribed doses of Cymbalta and Gabapentin were doubled shortly before the offenses.

{¶ 110} Brinkman also told Dr. Stinson that he had sustained multiple head injuries over the course of his life. Brinkman reported that he had been hit in the head with a baseball bat, beer bottles, and rocks. But on cross-examination, Dr. Stinson admitted that he had never seen any medical records substantiating those claims.

### 6. Brinkman's mental condition

{¶ 111} Dr. Stinson conducted a "mitigation evaluation for purposes of potential sentencing." He interviewed Brinkman for more than 13 hours over several meetings. He also reviewed summaries of interviews that the defense's mitigation specialist had conducted with Brinkman, George Sr., and two of Brinkman's friends; earlier expert evaluations of Brinkman; and educational, medical, mental-health, military, and prison and jail records.

{¶ 112} Dr. Stinson testified that there are ten possible "adverse childhood experiences" ("ACEs") that place a child at risk of negative outcomes by interrupting the child's neurodevelopment: (1) physical abuse, (2) emotional abuse, (3) sexual abuse, (4) physical neglect, (5) emotional neglect, (6) parental divorce, (7) witnessing one's mother being treated violently, (8) substance abuse in the home, (9) incarceration of a parent, and (10) mental-health problems in the family. According to Dr. Stinson, "almost everybody has been exposed to one of [the ACEs]," but "with each additional [ACE,] * * * the risk for negative outcomes goes up, and by and large individuals who have experienced four or more are at the highest risk for all sorts of negative outcomes." Dr. Stinson determined that Brinkman had had nine ACEs; the only one he did not report was sexual abuse.

{¶ 113} According to Dr. Stinson, 2015 was a "pivotal point [in Brinkman's life] that sent him in a downward spiral and * * * lands us where we're at today." That year, Brinkman was diagnosed with multiple medical problems. He also broke up with his girlfriend and then discovered that she had been abusing drugs and had drained one of his financial accounts. Later that year, Brinkman's brother committed suicide and he became homeless.

{¶ 114} While homeless, Brinkman lived in his van, slept on others' couches whenever he could, and traded work for lodging. He did some remodeling of his stepfather's condominium, where Brinkman's mother had lived. Being back in his mother's last home brought up unresolved grief about her death. And

Brinkman generally felt unvalued as an individual, sensing that people only valued him if he could do something for them.

{¶ 115} Dr. Stinson diagnosed Brinkman with recurrent major depressive disorder, which probably started in Brinkman's childhood, post-traumatic stress disorder ("PTSD"), borderline personality disorder, and substance-abuse disorders. When Dr. Stinson reviewed Brinkman's history, "it became apparent to [him] that [Brinkman] had been depressed for a long time, probably since about elementary school, * * * [and] probably owing to the dysfunction in his family and the abuse that was happening in the home."

{¶ 116} Brinkman's ex-wife stated that Brinkman had been "suicidal since he was a teenager—wanting to die for a long time." Brinkman told Dr. Stinson about his two suicide attempts and indicated that he "was thinking about suicide shortly before his arrest." Brinkman reported that his moods cycled between extreme highs and lows within short periods. Dr. Stinson "considered that that could be evidence of a bipolar disorder," but he ultimately concluded that Brinkman had "chronic depression * * * and [that] his mood is reactive because of the post-traumatic stress that he experiences from his trauma history and his abuse." Dr. Stinson found it noteworthy that Brinkman had "guilt about things over which he had no control," such as when his brother was hit and dragged by a car or when his friend had shot himself.

{¶ 117} Test results from Brinkman's past evaluations were "very consistent with somebody who was experiencing post-traumatic stress." Dr. Stinson further observed that Brinkman's "history of trauma" (including his childhood trauma) fueled his borderline personality disorder, which Dr. Stinson explained is a chronic condition that impacts interpersonal relationships and mood stability.

{¶ 118} Dr. Stinson also diagnosed Brinkman with substance-abuse disorders related to his abuse of alcohol and marijuana. Brinkman tried to stop

drinking in 2006 but returned to drinking "on at least three occasions." Brinkman said he started using drugs when he was about 15 years old. According to Dr. Stinson, the diagnosis of substance-abuse disorders is "based on [a] pattern of use, [a] history of use," and as to alcohol, Brinkman met seven diagnostic criteria, which categorized his disorder as severe. Brinkman's marijuana use was categorized as mild.

**{¶ 119}** Dr. Stinson noted that Brinkman had never had the mental-health treatment that he needed and that Brinkman's evaluation at the Nord Center in 2016 was "the one and only time that he sought mental health treatment or got any mental health treatment other than while he's been incarcerated."

*7. Acceptance of responsibility and adjustment to prison*

**{¶ 120}** Dr. Stinson testified that Brinkman had "fully acknowledged his responsibility," noting that this was reflected in Brinkman's decision "to accept responsibility and in fact plead guilty to the charges." Yet Dr. Stinson conceded that he was "aware from the videos * * * that when [Brinkman] maybe was first arrested, [he] didn't readily acknowledge his responsibility" for the murders.

**{¶ 121}** While he was incarcerated pending trial, Brinkman wrote a letter to Jason and his family, apologizing to them. He told them that he wished that he "could take it all back" and acknowledged that he "caused the death of [Gene] & Bobbi." In a postscript, Brinkman added, "[T]he police treated me with respect and have not forced me to say or do anything. I did this of my own free will so you could start the healing process."

**{¶ 122}** Dr. Stinson testified that Brinkman had "had no significant problems while incarcerated." He further opined that Brinkman was "probably fairly well secured and * * * so he's probably well controlled in that setting." He noted, however, that he had worked on other cases in which an "equally well controlled" defendant had "acted out."

## C. Sentence evaluation

{¶ 123} Brinkman grew up in a chaotic and violent household. Both of his parents had exhibited substance-abuse problems. Brinkman's father had routinely beat Brinkman, and he often witnessed his father abusing his mother. For the first ten years of his life, Brinkman's mother "could not be fully emotionally available because of [her own issues]." These experiences and their effects on Brinkman's mental health are the strongest mitigation in this case.

{¶ 124} Brinkman has had major depression and PTSD for much of his life, and he never received adequate treatment. *See State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 209; *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 296; R.C. 2929.04(B)(7). He told Dr. Stinson that his family had lacked the means to obtain mental-health help when he was young and that he was not doing better in his adulthood. In fact, Brinkman was homeless just before committing the offenses in this case.

{¶ 125} While this court has "seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood," *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 174, we do give this evidence some weight. And we accord some weight to Brinkman's history of experiencing and witnessing trauma and abuse throughout his childhood, the effect of that history on his mental health, and his untreated mental-health problems. *See State v. Treesh*, 90 Ohio St.3d 460, 492, 739 N.E.2d 749 (2001) (considering evidence of mental-health problems under R.C. 2929.04(B)(7) when the evidence did not satisfy the requirements of R.C. 2929.04(B)(3)).

{¶ 126} Brinkman's brief military service is entitled to some weight under R.C. 2929.04(B)(7). *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 302. And the evidence showed that Brinkman displayed appropriate behavior in jail, that he responds well to highly structured environments, and that he would most likely easily transition into a model prison

inmate. Thus, we also give Brinkman's adjustment to incarceration some weight. *See State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 179.

{¶ 127} Brinkman expressed remorse in his unsworn statement, acknowledging that Gene and Bobbi "were extremely kind, caring and wonderful people who did not deserve to be killed." But Brinkman's showing of remorse in court is undermined by the evidence that his initial confession was not truthful. *See Kirkland* at ¶ 177. Despite physical evidence showing that the guest-bedroom door had been shot open, Brinkman continued to deny having chased the Johns to that location. Brinkman also never admitted that he had intentionally shot Gene, knowing the gun was loaded. Instead, Brinkman said that the gun just "went off." Further, to avoid getting caught, Brinkman lied to Jason about Gene and Bobbi's whereabouts, leaving Jason to stumble upon their bodies. Thus, we accord little weight to Brinkman's post-arrest expressions of remorse. *See State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 113, quoting *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 119 (" 'Retrospective remorse' is entitled to little weight").

{¶ 128} Yet Brinkman's guilty pleas, as well as his statements to the panel in which he accepted responsibility for the murders and said that the death penalty was the only way to achieve justice in this case, deserve significant weight in mitigation. Combined, those actions demonstrate that Brinkman ultimately acknowledged his culpability for the murders. *See Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 185.

{¶ 129} Brinkman's alcohol and drug use were not related to the offenses in this case, so we give minimal weight to evidence of Brinkman's substance-abuse disorders. Likewise, Brinkman's medical issues—diabetes being the primary concern—are entitled to little weight because there was no evidence that Brinkman's conduct directly resulted from those conditions. Brinkman admitted that he had properly fed himself during the afternoon on the date of the offenses.

**{¶ 130}** The remaining factors in R.C. 2929.04(B) do not assist Brinkman. The Johns did not induce or facilitate the murders and there was no evidence that Brinkman had been under duress, coercion, or strong provocation. Brinkman was 45 years old when he committed these offenses, so the mitigation factor of youth does not apply. He was the sole offender, so he is not entitled to mitigation based on his degree of participation. Brinkman has a prior criminal history, having spent time in prison for other theft-related offenses. Although he had some mental-health conditions, there is no indication that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the law. And the nature and circumstances of the aggravated murders offer absolutely nothing in mitigation.

**{¶ 131}** Although we find that Brinkman's mitigating evidence is entitled to some weight, we nevertheless conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt as to each aggravated murder. Brinkman's decision to shoot Gene multiple times and to subject Bobbi to multiple forms of violence, including beating her on the head with Gene's gun and smothering her, outweighs his mitigation.

### D. Proportionality

**{¶ 132}** We further conclude that with respect to the aggravated murder of each victim, the death penalty is both appropriate and proportionate when compared with other capital cases involving a course of conduct under R.C. 2929.04(A)(5). *See, e.g.*, *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 1, 229 (two murders); *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 120 (two murders). The death penalty is also appropriate and proportionate here when compared with capital cases involving aggravated murders committed during an aggravated burglary. *See, e.g.*, *State v. Davie*, 80 Ohio St.3d 311, 334-335, 686 N.E.2d 245 (1997).

## VII. CONCLUSION

**{¶ 133}** We affirm Brinkman's convictions and death sentences. But we reverse the trial court's judgment imposing postrelease control on Counts 3, 4, and 5, and we remand Brinkman's case to the trial court with instructions for it to vacate postrelease control as to those counts.

Judgment affirmed in part
and reversed in part,
and cause remanded.

O'CONNOR, C.J., and KENNEDY, FISCHER, DONNELLY, and STEWART, JJ., concur.

BRUNNER, J., concurs, with an opinion.

———————————

**BRUNNER, J., concurring.**

**{¶ 134}** I agree with the majority that appellant George Brinkman's convictions and sentences should be affirmed. I write separately to address Brinkman's fourth proposition of law, which presents the issue whether the trial court erred when the presiding judge of the three-judge panel determined the admissibility of evidence during the plea hearing without the contemporaneous participation of the rest of the panel. Statutory law and caselaw requires that when a defendant who is charged with an offense punishable by death pleads guilty to that offense, decisions on the admissibility of evidence, even at the defendant's plea hearing, must be made by all three judges on the panel.

**{¶ 135}** Because Brinkman was charged with two counts of aggravated murder with death specifications, a three-judge panel was convened in his case pursuant to R.C. 2945.06. Brinkman waived his right to a jury trial and entered guilty pleas to the charges against him. At the plea hearing, the panel heard testimony from four witnesses and received written stipulated facts and exhibits.

At the end of the hearing, however, Brinkman's counsel objected to the admission of 13 photographs of the victims.

{¶ 136} At that point, the presiding judge released the other two judges on the panel, stating as follows:

> [T]he case is considered complete at this point for purposes of the panel to recess and deliberate, so I will ask my colleagues to go ahead and recess for that purpose and I will join them in just a moment once I have determined which exhibits I will be bringing back with me to engage in our deliberations.

The presiding judge proceeded on her own to hear arguments and issue a ruling on the admissibility of the photographs. As noted by the majority, the presiding judge overruled the defense's objections to 12 of the photographs but sustained its objection to one autopsy photograph. The presiding judge then deliberated with the other two judges, and the panel found Brinkman guilty on all counts and specifications in the indictment.

{¶ 137} The procedure followed by the trial court in this jury-waived death-penalty case that was heard by a panel of three judges violated R.C. 2945.06, which provides:

> The judges or a majority of them may decide all questions of fact and law arising upon the trial; however the accused shall not be found guilty or not guilty of any offense unless the judges unanimously find the accused guilty or not guilty. If the accused pleads guilty of aggravated murder, a court composed of three judges shall examine the witnesses, determine whether the accused

is guilty of aggravated murder or any other offense, and pronounce sentence accordingly.

{¶ 138} The first sentence of the above-quoted passage is composed of two independent clauses and is not directly applicable here because it addresses questions of fact and law "arising upon the trial." *Id.* Here, Brinkman pleaded guilty to all the charges against him. The trial court therefore proceeded under the second sentence of the passage, which is silent on how decisions concerning the admissibility of evidence are to be made. Nonetheless, when the second sentence is read with the first, it is clear that the first sentence informs the meaning of the second sentence.

{¶ 139} The first independent clause of the first sentence provides that decisions on "questions of law and fact"—which I believe includes questions regarding the admissibility of evidence—shall be decided by "[t]he judges or a majority of them." *Id.* That clause therefore makes clear that decisions on questions of law and fact in a bench trial in a capital case must be made by a vote of the entire panel—by either a unanimous decision of "the judges" or a two-to-one decision by a "majority of them." *Id.* The second independent clause is an exception to that general rule: the question whether the defendant is guilty or not guilty must be unanimous. A split decision is not permitted on the ultimate question of guilt.

{¶ 140} But when a defendant pleads guilty under R.C. 2945.06, the second sentence of the above-quoted passage requires the panel to decide the issue of guilt in the same manner as that used in a bench trial: the panel must "determine whether the accused is guilty of aggravated murder or any other offense." *Id.* The court's reaching that decision, whether following a trial or a guilty plea, requires the consideration of evidence, which turns on questions of law and fact. This rule does

not parse whether the finding as to the defendant's guilt is reached by a jury or by the trial court.

{¶ 141} Given this and the gravity of the ultimate potential penalty, a fair reading of R.C. 2945.06 requires that all three judges on the panel vote on the admissibility of evidence in a death-penalty bench proceeding, even one involving a guilty plea, when determining the defendant's guilt. Moreover, we have reiterated that appellate review of a ruling on a motion to suppress evidence presents a mixed question of fact and law and that a trial court's findings of fact are to be given deference when they are supported by competent, credible evidence. *State v. Harrison*, 166 Ohio St.3d 479, 2021-Ohio-4465, 187 N.E.3d 510, ¶ 11 (lead opinion), citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, and *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982).

{¶ 142} The vote on the admissibility of evidence may be unanimous or split, but one of the judges on the panel may not rule on such matters of fact and law alone. In a case involving a three-judge panel, the "trial court" is the three judges composing the panel. If deference is to be given to the evidentiary determinations of the trial court, it must indeed be to the three-judge panel.

{¶ 143} The trial court erred by ruling on the admissibility of the 13 challenged photographs through the decision of the presiding judge alone. R.C. 2945.06 and our caselaw on the nature of evidentiary rulings required the entire panel to participate in that decision.

{¶ 144} Notwithstanding this, I agree with the majority that this error does not require reversal in this instance. Because Brinkman did not object to the failure of the entire panel to rule on the admissibility of the photographs, we review the issue only for plain error. I agree with the majority that "Brinkman has not demonstrated a reasonable probability that the outcome of the proceeding would have been different had the entire panel ruled on his evidentiary challenges." Majority opinion, ¶ 46.

{¶ 145} For these reasons, I concur.

————————————

Kyle L. Stone, Stark County Prosecuting Attorney, Lisa A. Nemes, Chief Appellate Prosecuting Attorney, and Vicki L. DeSantis, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Kathryn L. Sandford and Randall L. Porter, Assistant Public Defenders, for appellant.

————————————